## Commissioner of Revenue vs. Comcast Corporation & another.[1]

Suffolk. November 4, 2008. - March 3, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Attorney at Law,* Attorney-client relationship, Work product. *Privileged Communication. Evidence,* Privileged communication. *Accountant. Taxation,* Commissioner of revenue. *Practice, Civil,* Reconsideration, Review of interlocutory action. *Rules of Civil Procedure.*

Discussion of the standard of review employed by this court in an appeal from a Superior Court judge's ruling on a privilege claim in connection with a motion to compel the production of documents. [301-303]

The attorney-client privilege did not protect from disclosure communications between an in-house counsel and outside tax consultants consulted by counsel regarding the structuring of a sale of stock mandated by an antitrust consent judgment, where the communications, whether classified as tax advice or legal advice, were not necessary for effective consultation between the counsel and his client [303-311]; however, the work product doctrine protected such communications from disclosure, where the documents at issue, which constituted opinion work product, could be fairly said to have been prepared or obtained because of the prospect of litigation, and where the party seeking production failed to meet the burden of demonstrating that the circumstances of the case were so extremely unusual as to overcome the greater protection afforded opinion work product [313-319].

This court declined to address an issue that had been raised for the first time in the trial court on a motion to reconsider. [311-313]

Civil action commenced in the Superior Court Department on May 26, 2005.

Motions to compel production of certain withheld documents and for reconsideration were heard by *Frank M. Gaziano,* J., and entry of final judgment was ordered by *Thomas E. Connolly,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William W. Porter,* Assistant Attorney General, for the plaintiff.

[1] Continental Teleport, Inc., also known as Continental Holding Company.

*David J. Nagle* for the defendants.

*John S. Brown, George P. Mair, Donald-Bruce Abrams, & Matthew D. Schnall,* for New England Cable & Telecommunications Association, Inc., amicus curiae, submitted a brief.

*Shirley K. Sicilian & Sheldon H. Laskin,* for Multistate Tax Commission, amicus curiae, submitted a brief.

MARSHALL, C.J. We transferred this appeal here on our own motion to consider whether the attorney-client privilege or the work product doctrine protect from disclosure communications between an in-house corporate counsel and outside tax accountants consulted by him regarding the structuring of a sale of stock mandated by an antitrust consent judgment.

In connection with an audit examination by the Commissioner of Revenue (commissioner)[2] of Comcast Corporation's (Comcast's)[3] corporate excise tax returns for the tax period November 1, 1996, through December 31, 1997, the commissioner is investigating whether Comcast and its affiliates improperly failed to pay Massachusetts corporate excise taxes in connection with the forced liquidation of shares of stock that yielded approximately $500,000,000 in capital gains. The capital gains were reported on a Comcast affiliate's Federal tax return but were not reported on any Massachusetts corporate excise tax return. The commissioner sought the production of documents through an administrative summons pursuant to G. L. c. 62C, § 70.[4] Comcast responded that some of the documents were protected by the attorney-client privilege and the work product

---

[2]Because the present Commissioner of Revenue (commissioner) is a woman, we shall use the female pronoun.

[3]Through a series of mergers not relevant to this appeal, Comcast Corporation (Comcast) is the successor company to AT&T Broadband, which in turn was the successor company to MediaOne Group, Inc. (MediaOne), which in turn was the successor company to US West, Inc. (US West). US West entered into the antitrust consent decree with the United States that is the genesis of the events that gave rise to the Massachusetts Department of Revenue's (department's) audit examination.

[4]General Laws c. 62C, § 70, provides: "The commissioner may take testimony and proofs under oath with reference to any matter within the official purview of the department of revenue, and in connection therewith may issue summonses and require the attendance and testimony of witnesses and the production of books, papers, records, and other data. Such summonses shall be served in the same manner as summonses for witnesses in criminal cases issued on behalf of the commonwealth, and all provisions of law rela-

doctrine.[5] The commissioner then filed a complaint in the Superior Court seeking to compel production of the withheld documents. The commissioner's request was denied, the judge ruling that the documents at issue in this appeal were protected by the privilege and the work product doctrine. The commissioner moved unsuccessfully for reconsideration. Pursuant to a joint motion of the parties, final judgment entered in the Superior Court. See Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977). The commissioner appealed. We conclude that the documents are protected from disclosure by the work product doctrine. We affirm.[6]

1. *Factual background.* The audit examination of Comcast and its affiliates, see note 3, *supra*, by the Department of Revenue (department) was commenced in June, 2000, three years after the acquisition of Continental Cablevision, Inc. (Continental Cablevision), by US West, Inc. (US West), a predecessor to Comcast. That acquisition gave rise to an antitrust challenge by the United States Department of Justice. We describe briefly the antitrust action and the related corporate transactions before turning to the documents at the center of this litigation. The facts are undisputed unless otherwise noted.

a. *The stock sale.* In February, 1996, Colorado-based US West announced plans to purchase Continental Cablevision, a Massachusetts cable television company with headquarters in Boston.

tive to summonses in such cases shall, so far as applicable, apply to summonses issued hereunder. Any justice of the supreme judicial court or of the superior court may, upon the application of the commissioner, compel the attendance of witnesses, the production of books, papers, records, and other data, and the giving of testimony before the commissioner in the same manner and to the same extent as before the said courts."

[5]Comcast claims that throughout the lengthy response process it informed the commissioner that some responsive documents were protected from production by the attorney-client privilege and the work product doctrine, and it provided the commissioner with a privilege log of all of the withheld documents. Comcast later produced some of the documents as not privileged. Comcast also provided redacted versions of some documents on the ground that the redactions were of information not relevant to the audit examination or the summons. The redacted documents and some of the documents withheld as privileged are no longer at issue in this appeal. See note 14, *infra*.

[6]We acknowledge the amicus brief filed by the Multistate Tax Commission in support of the commissioner and by the New England Cable & Telecommunications Association, Inc., in support of Comcast.

Through a wholly owned subsidiary, Continental Teleport, Inc. (Continental Teleport), Continental Cablevision at the time owned 11.2 per cent of the stock of Teleport Communications Group, Inc. (TCG), a company that, like US West, was a local telecommunications services provider.[7] Continental Teleport, like its parent Continental Cablevision, was a Massachusetts corporation. The acquisition of Continental Cablevision by US West was completed on November 15, 1996, and Continental Cablevision was immediately merged into MediaOne Group, Inc. (Media-One), a wholly owned subsidiary of US West.

Meanwhile, on November 5, 1996, the Department of Justice filed a civil antitrust action against US West and Continental Cablevision, see 15 U.S.C. §§ 18, 25, alleging that the acquisition would lessen competition in the market for dedicated telecommunications services. The Department of Justice, US West, and Continental Cablevision agreed to settle the antitrust claims, and on February 28, 1997, a final judgment entered whose terms required that, to preserve competition in the sale of dedicated communication services in certain markets, US West divest, on or before June 30, 1997, the portion of TCG stock necessary to reduce US West's ownership interest to less than ten per cent of the outstanding shares of TCG common stock, and to further divest all remaining interest in TCG on or before December 31, 1998.

US West retained the investment firm Lehman Brothers Inc. to assist it with the required sale of the TCG stock. Because the stock sale was anticipated to have significant tax consequences for US West, Thomas Kennedy, executive director of US West's tax department, turned to Attorney Andrew E. Ottinger, Jr., at the time serving in US West's Colorado-based law department, for advice regarding options for structuring the stock sale. Ottinger was an experienced tax litigator, but was unfamiliar with Massachusetts tax law. Concerned that the Massachusetts Department of Revenue (department) would challenge, in Ottinger's words, "the appropriateness of the chosen vehicle" for US West's sale of the TCG stock, Ottinger sought the advice of two

[7]In addition to its business as a telecommunications service provider, US West owned multimedia, telecommunications, domestic directory, and communication businesses.

Massachusetts-based partners of Arthur Andersen LLP (Andersen), in circumstances we shall later describe in some detail.

After receiving advice from Andersen, US West caused the following transactions to occur. On February 11, 1997, a new entity, Continental Holding Company (Continental Holding), a Massachusetts corporate trust, G. L. c. 62, § 8, was established by US West. That same day, Continental Teleport was dissolved, and its assets, including its then remaining TCG shares,[8] were simultaneously transferred to Continental Holding. US West subsequently divested itself of the TCG shares in four separate transactions, culminating with the largest sale on November 30, 1997.[9]

Continental Holding reported a capital gain of $495,733,830 from the sale of the TCG shares on its December 31, 1997, Federal tax return. Claiming an exemption as a Massachusetts corporate trust under G. L. c. 62, § 8 (b), it did not file a Massachusetts corporate excise tax return for that same taxable period.[10,11] Continental Holding was dissolved on February 12, 1999, two years after its creation, and its assets transferred to US West's successor.

---

[8]A relatively small number of TCG shares had been sold by Continental Teleport prior to its reorganization into Continental Holding. See note 9, infra.

[9]The details of the TCG share transactions are as follows:

| Date of Sale | No. of TCG Shares | Net Proceeds | Gain |
|---|---|---|---|
| 1/31/97 | 75,000 | 2,354,625 | 1,154,625 |
| 2/21/97 | 4,000,000 | 117,000,000 | 76,712,926 |
| 6/12/97 | 2,000,000 | 57,750,000 | 37,606,463 |
| 9/15/97 | 1,840,000 | 67,850,000 | 49,317,946 |
| 11/30/97 | 9,945,592 | 432,265,698 | 332,095,997 |

[10]According to the commissioner, under G. L. c. 62, § 8 (a), as in effect in 1997, a Massachusetts corporate trust was treated as an individual rather than a corporation for income and capital gains purposes. See G. L. c. 62, § 8 (a), as amended through St. 1994, c. 195, §§ 25, 26. Pursuant to G. L. c. 62, § 8 (b), a corporate trust that qualified as a "holding company" was exempt from tax.

[11]The commissioner claims that Comcast owes the Commonwealth "an estimated $52 million" in corporate excise taxes. Comcast responds that the claim is unsubstantiated, ignores Continental Teleport's reorganization as a Massachusetts business trust, and does not take into account facts indicating that Continental Teleport's commercial domicil shifted to Colorado immediately on the November 15, 1996, merger of Continental Cablevision and US West. Resolution of this dispute is not part of this appeal.

b. *Retention of Arthur Andersen LLP.* Prior to US West's disposition of the TCG stock, its in-house tax counsel Ottinger retained Andersen for advice. Because the circumstances of that retention are central to the legal issues, we recite them in some detail.

Ottinger graduated from law school in 1977 and joined the tax department of US West in 1986. In 1987, he transferred to US West's law department, where he served as State and local tax counsel until 2000, except for a brief period as regulatory counsel in 1995-1996. Ottinger initially became involved with US West's acquisition of Continental Cablevision while he was serving as regulatory counsel, but it was in his position as State and local tax counsel that he sought Andersen's advice regarding the impending sale of TCG stock.

As State and local tax counsel, Ottinger was US West's attorney "chiefly responsible" for property tax, State income tax, and sales and use tax matters. He spent approximately forty per cent of his time working on tax-related litigation, handling one-half of those matters himself and retaining outside counsel for the remainder. In connection with his own cases, Ottinger regularly prepared assessments analyzing litigation risks for US West to evaluate the appropriateness of a tax determination. Because US West had, in Ottinger's words, a "sophisticated Tax Department," he rarely hired outside tax consultants to assist him, although he did so on occasion.

With respect to the particular matter at issue here — the sale of the TCG stock compelled by the antitrust consent decree — Ottinger understood the transaction to have significant tax consequences for US West. Accordingly, he explained, he examined "planning opportunities" for the transaction himself, but turned to experienced "outside consultants" to help him "interpret Massachusetts law," because he himself lacked sufficient understanding of Massachusetts tax law.[12] Specifically, Ottinger stated that he considered "various ways to set up the transaction, to determine the best, legitimate vehicle by which to deal with the tax consequences from the sale of [TCG] shares, and to assess the risks of litigation associated with the different vehicles." Ottinger

[12]All of Ottinger's statements are taken from an affidavit filed in opposition to the commissioner's motion to compel.

ultimately retained Michael E. Porter, III, and Edward Gartland, two Massachusetts-based Andersen partners. Both had previously been employed by the department, Porter as a senior attorney at the department.[13] During January and February, 1997, Ottinger spoke with Porter and Gartland on several occasions, to discuss the various options for US West to follow relating to the sale of TCG stock, and to assess the risks of and exposure to litigation for any "vehicle" considered. He asked the Andersen partners to prepare a memorandum discussing the "pros and cons of the various planning opportunities and the attendant litigation risks," which they did. The Andersen memoranda (various drafts of the requested memorandum) are the documents in contention here.

Ottinger stated that he considered all of his communications with the Andersen partners to be attorney-client communications and attorney work product, and, accordingly, "took all necessary precautions" to ensure that documents received from Andersen remained "confidential and privileged," including sending the documents to the segregated, locked files of US West's law department maintained for privileged documents.

c. *The challenged documents.* Six of the documents withheld by Comcast are at issue in this appeal.[14] The six documents are different drafts and the final memorandum prepared by the Andersen partners at the request of Ottinger before the corporate reorganization took place.[15] The Andersen memoranda, each

---

[13]Although Michael E. Porter, III, was licensed to practice law, he was precluded from practicing law while employed by Andersen. See S.J.C. Rule 3:07, Canon 3, DR 3-103 (A), as appearing in 382 Mass. 777 (1981). He testified at a deposition taken by the department, as did Edward Gartland, that he provided tax and planning advice, and not legal advice, to Ottinger.

[14]The commissioner originally sought the production of all documents identified by Comcast on its privilege log. See note 5, *supra.* These included memoranda and letters from various law firms and communications from US West's in-house counsel to other US West attorneys. The commissioner contests here only the judge's determination that the attorney-client privilege or work product doctrine applied to the Andersen memoranda. As for these, there appears to be some confusion as to the number of copies of the Andersen memoranda sought by the commissioner. In her brief and at oral argument, the commissioner referred to four documents. As Comcast makes no claim that any of the Andersen memoranda should be treated differently from the others, our ruling applies to all copies of the memorandum and any drafts thereof.

[15]The six documents are identified as follows. One document (2CCI 768-784) is identified as the first draft of the Andersen memorandum. It is dated

addressed "to file," and some sixteen pages long, single spaced, address the structuring of the required sale of TCG stock. The memoranda contain a detailed analysis of various corporate entities and address various options, and attendant litigation risks, for the TCG stock sale in light of applicable Massachusetts law.

2. *Prior proceedings.* a. *Audit and administrative summons.* The department commenced its audit in June, 2000. According to the commissioner, the issue relevant to this appeal is whether US West had what the commissioner terms "a legitimate business purpose" for reorganizing Continental Teleport as a Massachusetts corporate trust (i.e., as Continental Holding) at the time the sale of TCG stock that resulted in the substantial capital gains described above was being contemplated. The commissioner claims that, during the department's investigation, US West did not identify any independent economic or business purpose for the reorganization; she contends that disclosure of the Andersen memoranda will "reveal detailed information about why the transaction was structured as it was."[16]

During the first four years of the audit, the department issued

February 1, 1997, and attached to a facsimile transmission cover sheet dated February 12, 1997, and addressed from Ottinger to Jennifer Taub, whom Ottinger identifies as, "Executive Director of Tax at Continental Cablevision." Two documents (2CCI 436-450 and 2CCI 451-465), dated February 7, 1997, are identical to each other and appear to be the second draft of the memorandum. Two further documents (2CCI 001-14 and 2CCI 033-46) are identical to the second drafts of the memorandum, but each is missing its first page. These two documents are also dated February 7, 1997. The sixth document (2CCI 466-482) is the final version of the memorandum. It is dated February 7, 1997, and is attached to a cover letter dated May 14, 1997, from Andersen and directed to James A. Mohler, director of State and local taxes at US West. For convenience we shall refer to the six documents collectively as the Andersen memoranda.

[16]The commissioner asserts that, if there was no "legitimate business or economic purpose" for the transactions, she could invoke the "step transaction doctrine," a rule that, "for purposes of taxation, looks to the substance of a transaction over its form." *General Mills, Inc.* v. *Commissioner of Revenue,* 440 Mass. 154, 172 (2003). The step transaction doctrine "treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result." *Id.,* quoting *Penrod* v. *Commissioner,* 88 T.C. 1415, 1428 (1987). "If an intermediate step has no legitimate business purpose beyond tax avoidance, it may be collapsed for tax purposes under the step transaction doctrine." *General Mills, Inc.* v. *Commissioner of Revenue, supra.* In contrast, "if each such step

three information document requests, seeking information regarding Continental Teleport.[17] In response to these requests, Comcast produced certain records, which the commissioner deemed "insufficient." In May, 2004, the commissioner issued an administrative summons pursuant to G. L. c. 62C, § 70, seeking the production of records relating to the sale of TCG stock, including records dealing with the reorganization of Continental Teleport into Continental Holding. Comcast again produced responsive documents, but withheld others, including the Andersen memoranda, under claims of attorney-client privilege and work product doctrine, all of which were listed in the privilege log prepared by Comcast. See note 5, *supra*.

b. *Proceedings in the trial court.* In May, 2005, five years after the commencement of the audit, the commissioner filed a complaint in the Superior Court seeking to compel production of all of the documents listed on the Comcast privilege log as well as unredacted versions of all redacted documents. After a nonevidentiary hearing and an in camera review of the documents, a judge in the Superior Court denied the commissioner's motion, holding, inter alia, that the Andersen memoranda were protected by the attorney-client privilege because they contained "a detailed analysis of Massachusetts tax law" and "provided in-house counsel with legal information critical to his ability to effectively represent his client." The judge also concluded that the Andersen memoranda were protected by the work product doctrine as "prepared in anticipation of litigation." The judge later denied the commissioner's motion for reconsideration of so much of the order as related to the Andersen memoranda.

3. *Discussion.* We first address the standard of review of the judge's ruling on the commissioner's motion to compel.

The commissioner contends that our review is de novo where

demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid business purposes and not mere avoidance of taxes," the step transaction doctrine does not apply. *Commissioner of Revenue* v. *Dupee*, 423 Mass. 617, 624 (1996), quoting Rev. Rul. 79-250, 1979-2 C.B. 156. Accordingly, the commissioner contends, the absence of any legitimate business purpose for the reorganization of Continental Teleport into Continental Holding would be "highly relevant" to the commissioner's ability to invoke the step transaction doctrine to disregard the form of the transaction.

[17]The department issued the first request on July 13, 2001; additional requests were issued on April 24, 2002, and August 12, 2003.

the scope of the attorney-client privilege and the work product doctrine in a summons enforcement proceeding, as well as the interpretation of G. L. c. 62C, § 70, are questions of law. The commissioner also argues that because the evidence before the judge in the Superior Court comprised only affidavits and other documents, we may "assess the evidence anew," quoting *Meschi* v. *Iverson*, 60 Mass. App. Ct. 678, 681-682 n.7 (2004). Comcast responds that a more deferential standard of review is warranted. Citing *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda)*, 425 Mass. 419, 421 (1997) (*EM-LICO*), Comcast argues that decisions regarding the attorney-client privilege and the work product doctrine raise questions of fact reviewable for clear error. *Id.*, citing *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 113 (1997) ("existence of the privilege and the applicability of any exception to the privilege is a question of fact for the judge").

In general, we uphold discovery rulings "unless the appellant can demonstrate an abuse of discretion that resulted in prejudicial error." *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 653 (2003), citing *Solimene* v. *B. Grauel & Co.*, 399 Mass. 790, 799 (1987). Where the attorney-client privilege is concerned, however, our review is more textured. On appeal from any decision on a privilege claim, we review the trial judge's rulings on questions of law de novo.[18] We generally review a judge's fact findings, at least after a bench trial, for clear error. See Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). Where, as here, we are dealing with a motion to compel and the motion judge's findings are based solely on documentary evidence, we do not accord them any special deference. Cf. *Cavallaro* v. *United States*, 284 F.3d 236, 245 (1st Cir. 2002) (under Federal law findings of motion judge on documentary record reviewed

---

[18]Although we have not said so explicitly, we have in effect undertaken a de novo review of, for example, whether the crime-fraud exception to the attorney-client privilege applied in Massachusetts, see *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 112-113 (1997), whether the disclosure of a document by an anonymous source constituted a waiver of the privilege, see *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda)*, 425 Mass. 419, 422-423 (1997), or whether the common interest doctrine as an exception to waiver of the attorney-client privilege should be recognized in Massachusetts, see *Hanover Ins. Co.* v. *Rapo & Jepsen Ins. Servs., Inc.*, 449 Mass. 609, 612-617 (2007).

for clear error). We review discretionary judgments for abuse of discretion. See *Matter of a Grand Jury Investigation*, 437 Mass. 340, 356 (2002) (evidentiary ruling where privilege at issue). Mixed questions of law and fact, such as whether there has been a waiver, generally receive de novo review. See 2 P.R. Rice, Attorney-Client Privilege in the United States § 11.36, at 234-236 & nn. 43-46 (2d ed. 1999) (surveying Federal jurisprudence and concluding that appellate courts generally review mixed questions of law and fact de novo).

We turn now to the merits, and consider first whether the Andersen memoranda are protected by the attorney-client privilege.

*a. Attorney-client privilege.* The classic formulation of the attorney-client privilege, which we indorse, is found in 8 J. Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961): "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." See *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, 449 Mass. 444, 448 (2007) (privilege protects "all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice"). See generally Mass. G. Evid. § 502 (a) & (b), at 87-88 (2008-2009). The purpose of the privilege "is to enable clients to make full disclosure to legal counsel of all relevant facts . . . so that counsel may render fully informed legal advice," *id.* at 449, with the goal of "promot[ing] broader public interests in the observance of law and administration of justice." *Suffolk Constr. Co., supra* at 448 quoting *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981). That important societal interest is, however, in tension "with society's need for full and complete disclosure" in adversary proceedings. *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 482 (1990), quoting *In re Grand Jury Investigation*, 723 F.2d 447, 451 (6th Cir. 1983), cert. denied, 467 U.S. 1246 (1984). In *Hanover Ins. Co.* v. *Rapo & Jepsen Ins. Servs., Inc.*, 449 Mass. 609, 615-616 (2007), quoting *In re Grand Jury Investigation, supra*, and

*Commonwealth* v. *Goldman*, 395 Mass. 495, 502, cert. denied, 474 U.S. 906 (1985), we recently said:

> "The attorney-client privilege is so highly valued that, while it may appear 'to frustrate the investigative or fact-finding process . . . [and] create[] an inherent tension with society's need for full and complete disclosure of all relevant evidence during implementation of the judicial process,'. . . it is acknowledged that the 'social good derived from the proper performance of the functions of lawyers acting for their clients . . . outweigh[s] the harm that may come from the suppression of the evidence.' "

While the tension is unquestionably resolved in favor of recognizing the privilege, we have consistently held that we construe the privilege narrowly, in part to protect the competing societal interest of the full disclosure of relevant evidence. See *EMLICO, supra* at 421 (attorney-client privilege "ordinarily strictly construed"); *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 1)*, 424 Mass. 430, 457 n.26 (1997) ("We must, however, construe the privilege narrowly"). A narrow construction of the privilege is particularly appropriate where, as here, information is being withheld from the government in a tax enforcement proceeding. Cf. *Cavallaro* v. *United States, supra* at 245, quoting *United States* v. *Arthur Young & Co.*, 465 U.S. 805, 816 (1984) ("the doctrine of construing the privilege narrowly . . . has particular force in the context of IRS [Internal Revenue Service] investigations given the 'congressional policy choice in favor of disclosure of all information relevant to a legitimate IRS inquiry' ").

As the party asserting the privilege, Comcast bears the burden of establishing that the attorney-client privilege applies to the Andersen memoranda, a burden that "extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege, including: (1) the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been waived." *EMLICO, supra* at 421.

The commissioner argues that Comcast has not met its burden for three reasons. First, she claims, Comcast submitted no proof that the Andersen memoranda contain confidential communications from the client (US West) to Ottinger. Second, she asserts, the Andersen memoranda do not fall within the "derivative privilege" recognized in *United States* v. *Kovel*, 296 F.2d 918 (2d Cir. 1961) (*Kovel*). Last, she argues, the Superior Court judge improperly expanded the privilege where a narrow construction is required because Comcast is resisting a statutory demand for information.

As to the first point, the commissioner's argument appears to be based on an incorrect assertion that the privilege applies only where the underlying client information that is the subject of the communication is confidential in the sense that it is not public knowledge. Specifically, the commissioner argues that neither the requirement that US West sell Continental Cablevision's stake in TCG by the end of 1998 nor that US West was considering restructuring Continental Teleport were confidential. But information contained within a communication need not itself be confidential for the communication to be deemed privileged; rather the communication must be made in confidence — that is, with the expectation that the communication will not be divulged. See 2 P.R. Rice, Attorney-Client Privilege in the United States § 6.2, at 9-11 (2d ed. 1999), and cases cited ("The confidentiality that must be expected by the client relates to the client's *communication* with an attorney. . . . It is not necessary that the *information* within the communication be confidential. The communication from the client to the attorney may contain nonconfidential information . . . . This is not relevant to the point of whether confidentiality can reasonably be expected in the *communications* that contain that information" [emphases in original]); Restatement (Third) of the Law Governing Lawyers § 71 (2000) ("A communication is in confidence . . . if, at the time and in the circumstances of the communication, the communicating person reasonably believes that no one will learn the contents of the communication except a privileged person . . . or another person with whom communications are protected under a similar privilege"); *id.* at comment b, at 544 ("The matter communicated need not itself be secret"). Here there is no question that Ottinger intended to keep the com-

munications confidential, and he took steps to ensure that they were. In addition, as Comcast points out, in order to address appropriately the issues that Ottinger had identified, including exposure to litigation, Andersen received from counsel more than the publicly known fact that US West was required to dispose of the TCG stock.

Second, the commissioner challenges the judge's conclusion that the Andersen memoranda fall within the so-called derivative attorney-client privilege. Disclosing attorney-client communications to a third party, including an accountant, generally undermines the privilege. See *United States* v. *Ackert,* 169 F.3d 136, 139 (2d Cir. 1999) ("the attorney-client privilege generally applies only to communications between the attorney and the client"). There are exceptions. In Judge Friendly's landmark opinion, the United States Court of Appeals for the Second Circuit recognized that the privilege can shield communications of a third party employed to facilitate communication between the attorney and client and thereby assist the attorney in rendering legal advice to the client. *Kovel, supra* at 921-922. The exception can apply to accountants. *Kovel, supra* at 922 ("the presence of an accountant . . . while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege" any more than would that of linguist who "translates" when client speaks language different from attorney). The reason, explained Judge Friendly, is because "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* The privilege does not apply unless the communication with the accountant is made "for the purpose of [the client] obtaining legal advice from the lawyer." *Id.* "If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Id.* Now known as the *Kovel* doctrine or the derivative attorney-client privilege, see, e.g., 1 Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 217-218 (5th ed. 2007), the doctrine has deep roots in Massachusetts jurisprudence. See *Foster* v. *Hall,* 12 Pick. 89, 93 (1831) (privilege extends to communications with agents of attorney who are "necessary to secure and facilitate the communication between attorney and client"). See also *Hanover Ins. Co.* v. *Rapo & Jepsen Ins.*

*Servs., Inc.,* 449 Mass. 609, 616 (2007) (privilege protects "statements made to or shared with necessary agents of the attorney or the client, including experts consulted for the purpose of facilitating the rendition of such advice").

The commissioner argues that Comcast has failed to carry its burden of establishing that the derivative privilege protects the Andersen memoranda for two reasons. First, she asserts, the derivative privilege applies only where the accountant's services are necessary to "translate" or "interpret" so that the attorney is able to understand the client's situation in order to provide the requested legal advice. Second, the commissioner argues, the derivative privilege does not apply because US West sought professional tax advice, not legal advice of an attorney, from Andersen. We agree that a derivative privilege does not apply to the Andersen memoranda.

If the accountant's presence is "necessary" for the "effective consultation" between client and attorney, the privilege attaches. *Kovel, supra* at 922. That was the logic of *Kovel,* and the weight of authority affirms its continuing vitality. See, e.g., *United States* v. *Schwimmer,* 892 F.2d 237, 243-244 (2d Cir. 1989) (privilege applies where attorney for criminal defendant charged with financial crimes retained accountant as necessary to analyze defendant's financial transactions); *United States* v. *Judson,* 322 F.2d 460, 462 (9th Cir. 1963) (*Kovel* exception applies where attorney advising client for assistance with IRS investigation hired accountant to prepare client's net worth statement). The "necessity" element means more than "just useful and convenient." *Cavallaro* v. *United States,* 284 F.3d 236, 249 (1st Cir. 2002), quoting 1 E.S. Epstein, *supra* at 187. "The involvement of the third party must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Cavallaro* v. *United States, supra.* Thus courts have rejected claims that the derivative privilege applies where an attorney's ability to represent a client is improved, even substantially, by the assistance of an accountant. See *United States* v. *Ackert, supra* at 139 ("a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client"); *In re G-I Holdings*

*Inc.*, 218 F.R.D. 428, 434 (D.N.J. 2003) (*Kovel* "carefully limited the attorney-client privilege . . . to when the accountant functions as a 'translator' between the client and the attorney"); *United States* v. *Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1071 (N.D. Cal. 2002) ("The interpreter analogy and the statement that the accountant is needed to facilitate the client's *consultation* both strongly indicate that *Kovel* did not intend to extend the privilege beyond the situation in which an accountant was interpreting the client's otherwise privileged communications or data in order to enable the attorney to understand those communications or that client data" [emphasis in original]).[19] See also *Black & Decker Corp.* v. *United States*, 219 F.R.D. 87, 90 (D. Md. 2003) ("Cases decided after *Kovel* have narrowly interpreted this concept of derivative privilege"); Comment, Privileged Communications with Accountants: The Demise of *United States* v. *Kovel*, 86 Marq. L. Rev. 977, 978, 986 (2003) ("Over the past four decades, courts have repeatedly narrowed the holding in *Kovel*. As a result, there is very little protection left for communications with accountants"; communications from accountants that constitute "independent information and expertise for the attorney to use in representing his or her client" are not protected by attorney-client privilege).[20] We agree with the majority of courts that the *Kovel* doctrine applies only when the accountant's role is to clarify or facilitate communications between attorney and client.

It is apparent that the role of the Andersen partners was not necessary for effective communication between Ottinger and his client US West: Ottinger's affidavit and the Andersen memor-

[19]See *Allied Irish Banks* v. *Bank of Am., N.A.*, 240 F.R.D. 96, 104-105 (S.D. N.Y. 2007), citing *United States* v. *Kovel*, 296 F.2d 918 (2d Cir. 1961) (*Kovel*). (*Kovel* doctrine does not apply where third party was not acting as translator or interpreter of client communications).

[20]A few courts have applied the *Kovel* doctrine with less rigidity, see, e.g., *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003) (privilege protects confidential communications between attorneys and public relations consultants hired by attorneys to assist in dealing with media when communications were directed at handling client's legal problems); *Aull* v. *Calvacade Pension Plan*, 185 F.R.D. 618, 629 (D. Colo. 1998) (communications among accountant, client, and attorney are protected if they are "reasonably related" to purpose of client obtaining confidential legal advice from attorney), but they are in the minority.

anda demonstrate that Ottinger's purpose in consulting Andersen was to obtain advice about Massachusetts tax law, not to assist Ottinger with comprehending his client's information. Indeed Comcast is forthright in acknowledging that Andersen was retained "to provide [Ottinger] with information he needed to advise US West in its sale of the [TCG] stock." As Ottinger explained, he turned to the outside consultants who had experience in Massachusetts tax issues "to help me interpret Massachusetts law." The Andersen memoranda reveal that an analysis of Massachusetts law is precisely what Ottinger received. We do not doubt, as the motion judge held, that the Andersen memoranda were "critical to [Ottinger's] ability to effectively represent his client." But we agree with those courts holding that the privilege does not apply where the accountant provides "additional legal advice about complying with the tax code even where doing so would assist the attorney in advising the client." *United States* v. *Chevron Texaco Corp., supra* at 1072. See *United States* v. *Ackert, supra* at 139 ("a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client").

The decision in *United States* v. *Ackert, supra,* is instructive. In that case, the United States Court of Appeals for the Second Circuit held that conversations between a company's in-house counsel and an investment banker regarding the details of a transaction proposed by the investment banker, and the transaction's potential tax consequences, were not covered by the privilege, despite the assertion — similar to the one made here by Comcast — that "it was impossible for [counsel] to advise [the company] without these further contacts with [the investment banker]." *Id.* at 139. The communications were not privileged, even though the court assumed that counsel's communications with the investment banker "significantly assisted the attorney in giving his client legal advice about its tax situation." *Id.* Comcast argues that *United States* v. *Ackert, supra,* is distinguishable because in that case the investment banker proposed the transaction to the attorney, and "did not act as an advisor to legal counsel." While Comcast is correct that the investment banker initiated the discussions, see *id.* at 138, it misapprehends the nature of the com-

munications that followed as counsel sought the advice of the investment banker to formulate his own legal views.

In *In re G-I Holdings Inc.*, *supra*, the court reached a similar result on similar facts. There, as here, the company's attorneys retained an outside accountant "to explain tax concepts to in-house counsel so that in-house counsel could then render legal advice to [the company's] senior management." *Id.* at 435. The court rejected the argument that the attorney-client privilege should apply, despite the in-house attorney's assertion that the accountant's advice was "necessary in order for us to provide legal advice and counsel to the senior management." *Id.* In the court's view, neither the company nor its attorneys "needed [the accountant] to facilitate communications between them. They could communicate competently on their own." *Id.* at 436. We reach the same conclusion here.

The commissioner's second argument — that US West sought tax advice, not legal advice, from Andersen, and is therefore not privileged[21] — relies in large part on *United States* v. *Adlman*, 68 F.3d 1495 (2d Cir. 1995) (*Adlman I*), *S.C.*, 134 F.3d 1194 (2d Cir. 1998) (*Adlman II*). In *Adlman I*, in-house counsel asked an outside accountant to evaluate the "tax consequences" of a proposed corporate restructuring. *Id.* at 1497. The accountant produced a memorandum containing a "detailed legal analysis of likely IRS challenges" and "possible legal theories or strategies" that could be deployed in response. *Adlman II*, *supra* at 1195. Like Ottinger, the *Adlman* attorney claimed that the accountant's memorandum was prepared in order to assist him in rendering his advice to the company, and that he considered the memorandum "private and confidential." See *Adlman I*, *supra* at 1498. The court nevertheless determined that the *Kovel* doctrine did not shield the memorandum from disclosure. *Id.* at 1500. While the facts in *Adlman I* are somewhat different from

---

[21]The commissioner points in part to the deposition testimony of Porter and Gartland, the authors of the Andersen memoranda, that they gave tax — not legal — advice to Ottinger, see note 13, *supra*, as well as to Andersen's invoices to US West, that described the services provided as "professional tax services rendered in connection with . . . [r]esearch and state income tax planning related to Massachusetts Trust" and "[r]esearch, consultation, and memorandum regarding state tax issues involved in formation of Massachusetts corporate trust . . . ."

the facts here — as is inevitably the case — we agree with and adopt the reasoning of the *Adlman* court in that case.[22]

We recognize the difficulty of drawing a line between "legal" advice and "tax or accounting" advice given to a client in order to resolve on which side of the line the Andersen advice to US West fell. Here, whether characterized as "accounting advice" or "legal analysis," it was advice provided by third parties in circumstances that we have determined are not covered by the privilege, derivative or otherwise, so we need not resolve the point. We reject Comcast's suggestion that our decision rejecting its claim of privilege for the Andersen memoranda will reduce the attorney-client privilege to a "meaningless protection." Colorado-based Ottinger was free to seek advice on Massachusetts tax law from a Massachusetts attorney, where the privilege would apply. Instead, he sought advice on Massachusetts tax law from Massachusetts accountants, where no privilege applies. If his actions left his client potentially at risk, that is "the inevitable consequence of having to reconcile the absence of a privilege for accountants and the effective operation of the privilege of client and lawyer under conditions where the lawyer needs outside help." *Kovel, supra* at 922.

b. *Work product.* Because the Andersen memoranda are not protected by the privilege, we now consider whether they are protected from disclosure by the work product doctrine.

The work product doctrine, drawn from *Hickman* v. *Taylor,* 329 U.S. 495 (1947), functions "to enhance the vitality of an adversary system of litigation by insulating counsel's work from intrusions, inferences, or borrowings by other parties." *Ward* v. *Peabody,* 380 Mass. 805, 817 (1980), citing *Hickman* v. *Taylor, supra* at 511, and Developments in the Law — Discovery, 74 Harv. L. Rev. 940, 1028-1029 (1961). The purpose of the doctrine

_____

[22]In *United States* v. *Adlman,* 68 F.3d 1495, 1500 (2d Cir. 1995) (*Adlman I*), *S.C.,* 134 F.3d 1194 (2d Cir. 1998) (*Adlman II*), the court noted that the accounting firm in that case "sent a summary of its recommendations and conclusions directly to" the corporation's management, and that the firm was "regularly employed" by the corporation to furnish, among other things, auditing services. There is similar evidence in this record. A memorandum from Andersen was sent directly from Andersen to James A. Mohler, the director of State and local taxes at US West, see note 15, *supra*; and Andersen was the independent auditor for US West for the 1996 and 1997 tax years.

is to establish a "zone of privacy for strategic litigation planning . . . to prevent one party from piggybacking on the adversary's preparation." *Adlman I, supra* at 1501. While the attorney-client privilege shields communications between attorney and client (and in some circumstances third parties), the work product doctrine protects an attorney's written materials and "mental impressions." *Hickman* v. *Taylor, supra* at 510.

The commissioner argues that the language of G. L. c. 62C, § 70, see note 4, *supra*, requires that we examine the applicability of the doctrine in this case under the rules of criminal procedure, specifically Mass. R. Crim. P. 14 (a) (5), as appearing in 442 Mass. 1518 (2004), rather than under the broader discovery rule pertaining to civil matters, Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974). We decline to do so because the claim has been waived, as we now explain.

In the Superior Court, the commissioner did not make this argument in her motion to compel or at the hearing before the judge on the motion. She made the argument for the first time in a motion to reconsider the judge's order filed some fourteen months later. The motion judge ruled that the issue could have been raised in the motion to compel, and was waived. See *Commonwealth* v. *Gilday*, 409 Mass. 45, 46-47 n.3 (1991) (motion for reconsideration is not "the appropriate place to raise new arguments inspired by a loss before the motion judge"); *Publishers Resource, Inc.* v. *Walker-Davis Publ., Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (motion for reconsideration should not serve as occasion to tender new legal theories for first time). It was well within the judge's discretion not to consider the commissioner's new argument on the motion for reconsideration. See *Liberty Sq. Dev. Trust* v. *Worcester*, 441 Mass. 605, 611 (2004) (where party filed "amended" motion and motion for "reconsideration" seven weeks after action on original motion, judge not required to entertain party's "belated efforts to improve on its original motion"; no error in denial of motion that "merely seeks, as this one did, a 'second bite at the apple' "); *Clamp-All Corp.* v. *Foresta*, 53 Mass. App. Ct. 795, 807 (2002) (judge did not abuse discretion in denying motion for reconsideration where party was "a sophisticated litigant" and "failed to offer any substantial reason" why it had not filed affidavit "at the time it filed its

original motion"); *Anderson* v. *Cornejo*, 199 F.R.D. 228, 252-253 (N.D. Ill. 2000), and cases cited. See also *Int'l Strategies Group, Ltd.* v. *Greenberg Traurig, LLP*, 482 F.3d 1, 6 (1st Cir. 2007) ("We review a district court's denial of a motion for reconsideration or relief from judgment for abuse of discretion").

The commissioner argues that here, unlike *Commonwealth* v. *Gilday, supra*, she sought reconsideration of an *interlocutory* order rather than a final judgment, and waiver therefore does not apply. We do not agree. The commissioner cites no authority supporting her claim. In any event, motions to reconsider an interlocutory order are themselves not "appropriate vehicles to advance . . . new legal theories not argued before the ruling." *Zurich Capital Mkts. Inc.* v. *Coglianese*, 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005). Certainly a judge may exercise discretion and reconsider an interlocutory order when, for example, all parties and all issues will continue to be litigated. See *Anderson* v. *Cornejo, supra* at 253. But flexibility is not necessarily warranted here. The motion judge's order denying the commissioner's motion to compel was "interlocutory" only in the sense that it was not appealable until final judgment entered. The order, however, was a ruling on the only relief sought in the commissioner's complaint, production of withheld documents. The judge's order cannot be fairly characterized as an "order that relates to some intermediate matter in the case." Black's Law Dictionary 1130 (8th ed. 2004) (defining "interlocutory order").[23]

We therefore address Comcast's work product claims under

---

[23]Our ruling is buttressed by the observation that the commissioner was not diligent in her pursuit of this claim. The judge's order denying the commissioner's motion to compel entered on August 29, 2005. That order granted the commissioner leave to submit a supplemental filing addressing her "substantial need" for the memoranda and her inability to obtain substantially equivalent information "without undue hardship," the burden-shifting terms contained in Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974). There was no filing by the commissioner. Some nine months later, on June 9, 2006, Comcast's motion to dismiss the complaint for failure of the commissioner to respond was denied, and the commissioner was granted sixty additional days to respond. When the commissioner belatedly moved, on August 4, 2006, for reconsideration of the judge's original ruling, her motion did not conform to the Superior Court Rules. On October 25, 2006, nearly *fourteen months* after the judge ruled that the Andersen memoranda were protected from disclosure by the work product doctrine, the commissioner moved for reconsideration, raising for the first time her claim that the criminal rules apply. Reconsideration by the motion

the rules applicable to civil proceedings, as did the motion judge. The Massachusetts work product doctrine is codified in rule 26 (b) (3).[24] By its terms the rule protects a client's nonlawyer representatives, protecting from discovery documents prepared by a party's representative "in anticipation of litigation." The protection is qualified, and can be overcome if the party seeking discovery demonstrates "substantial need of the materials" and that it is "unable without undue hardship to obtain the substantial equivalent of the materials by other means." There is a further limitation: the court is to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." This so-called "opinion" work product is afforded greater protection than "fact" work product. See, e.g., *In re Grand Jury Subpoena*, 220 F.R.D. 130, 145 (D. Mass. 2004).

Courts have disagreed over whether the civil rule protection for opinion work product is "absolute" or merely "heightened."

judge was not warranted in these circumstances. See *Liberty Sq. Dev. Trust* v. *Worcester*, 441 Mass. 605, 610-611 (2004) (motions filed seven weeks after action on original motion were "untimely"); *Anderson* v. *Cornejo*, 199 F.R.D. 228, 253 (N.D. Ill. 2000) ("four-month delay in bringing the reconsideration motion goes against considering new arguments").

As to the appeal, on October 30, 2008, five days before oral argument was scheduled before this court, the commissioner submitted a letter purporting to apprise the court of "pertinent and significant authorities" related to her claim that the criminal rule should apply. See Mass. R. A. P. 16 (l), as appearing in 386 Mass. 1247 (1982). The cited authorities were all available at the time the commissioner filed her brief and reply brief; it was an attempt at "reargument in the disguise of a supplementary citation" that rule 16 (l) "does not authorize." *Commonwealth* v. *Siano*, 52 Mass. App. Ct. 912, 913 n.1 (2001), quoting Reporters' Notes to Mass. R. A. P. 16 (1), Mass. Ann. Laws Court Rules, Rules of Appellate Procedure, at 64 (Lexis 2000). We do not consider those arguments.

[24]Rule 26 (b) (3) provides in relevant part that "a party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

See *id.* (collecting cases). Even if not absolute, disclosure is appropriate only in rare or "extremely unusual" circumstances. See Reporters' Notes to Mass. R. Civ. P. 26 (b) (3), Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 545 (LexisNexis 2008) ("discovery, except in extremely unusual circumstances, may not be had of an attorney's mental impressions and similar intellectual work product. This protection applies also to 'other representative[s] of a party,' provided their work relates to litigation"); *Adlman II, supra* at 1204 ("at a minimum . . . a highly persuasive showing" is needed to overcome protection for opinion work product); *In re Grand Jury Investigation,* 599 F.2d 1224, 1231 (3d Cir. 1979) (interview memoranda "will be discoverable only in a 'rare situation' "). We need not decide here whether protection for opinion work product is absolute because we conclude that the commissioner has not made a "highly persuasive" showing that the circumstances in this case are so unusual that protection for opinion work product should be denied on a lower standard. See discussion, *infra.*

Comcast bears the burden of establishing that the Andersen memoranda were prepared in anticipation of litigation. See *Colonial Gas Co.* v. *Aetna Cas. & Sur. Co.,* 144 F.R.D. 600, 605 (D. Mass. 1992). If that burden is met, the burden shifts to the commissioner to demonstrate a substantial need for the memoranda and that she cannot obtain the substantial equivalent of the memoranda without undue hardship. See *United States* v. *Textron Inc. & Subsidiaries,* 507 F. Supp. 2d 138, 149 (D.R.I. 2007), aff'd in part, 557 F.3d 87 (1st Cir. 2009) ("The burden of establishing 'substantial need' rests on the party seeking to overcome the privilege"). Moreover, if the Andersen memoranda are "opinion" work product, the commissioner must make, at a minimum, a "far stronger showing of necessity and unavailability by other means." *Upjohn Co.* v. *United States,* 449 U.S. 383, 402 (1981).

The commissioner does not contest that the Andersen partners qualify as a "party's representative[s]" under rule 26 (b) (3). We therefore must determine the scope of the requirement of rule 26 (b) (3) that the Andersen memoranda be prepared "in anticipation of litigation" in order to qualify for work product protection. Specifically, in this case we must determine whether work product

protection is applicable "to a litigation analysis prepared by a party or its representative in order to inform a business decision which turns on the party's assessment of the likely outcome of litigation expected to result from the transaction." *Adlman II, supra* at 1197.

In *Adlman II, supra* at 1198, the court noted that the phrase "in anticipation of litigation" has given rise to a range of views by courts and commentators, and that "two tests had developed" as to documents that, although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of the litigation. The court then engaged in a lengthy discussion of the two tests, viz., (1) whether the documents "are prepared 'primarily or exclusively to assist in litigation' — a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision" and (2) whether the documents "were prepared 'because of' existing or expected litigation — a formulation that would include such documents, despite the fact that their purpose is not to 'assist in' litigation." *Id.* We need not repeat here the court's exploration of the contours of the two tests. It is sufficient to say that we agree with both the reasoning and the conclusion that the latter formulation ("because of" existing or expected litigation) is the correct test.[25] That test is "consistent with both the literal terms [of the rule] and the purposes" of the work product doctrine, *id.*, both of which "suggest strongly that work product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business decision." *Id.* at 1199. The "because of" test "appropriately focuses on both what should be eligible for the [r]ule's protection and what should

[25]The analysis in *United States* v. *Adlman*, 134 F.3d 1194, (1998) (2d Cir. 1998) (*Adlman II*), is based on Fed. R. Civ. P. 26 (b) (3) and Federal cases construing that Federal rule. See *Aldman II, supra.* Rule 26 (b) (3) of the Massachusetts Rules of Civil Procedure is identical in all material respects to the Federal rule. It is therefore appropriate to look for guidance to Federal interpretations of the Federal rule. See *Rollins Envtl. Servs., Inc.* v. *Superior Court*, 368 Mass. 174, 179-180 (1975) ("This court having adopted comprehensive rules of civil procedure in substantially the same form as the earlier Federal Rules of Civil Procedure, the adjudged construction theretofore given to the Federal rules is to be given to our rules, absent compelling reasons to the contrary or significant differences in content").

not." *Id.* at 1203. Thus, a document is within the scope of the rule if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared *because of* the prospect of litigation." *Adlman II, supra* at 1202, quoting 8 C.A. Wright, A.R. Miller, & R.L. Marcus, Federal Practice and Procedure § 2024, at 343 (1994) (Wright & Miller).[26] That test is consistent with our own jurisprudence. See *Ward* v. *Peabody*, 380 Mass. 805, 817 (1980) (preparation for litigation "includes litigation which, although not already on foot, is to be reasonably anticipated in the near future").[27]

We now apply the "because of" test to the facts in this case.[28] The commissioner argues that the Andersen memoranda do not meet that test because they were prepared to "avoid the prospect of litigation," citing In re Grand Jury Proceedings, U.S. Dist. Ct., No. M-11-189 (S.D.N.Y. Oct. 3, 2001),[29] and because, in her view, Ottinger's "conclusory assertions fall far short of demon-

---

[26]Prior to *Adlman II, supra,* five other Circuit Courts of the United States Court of Appeals had cited this formulation, *id.* at 1202, citing 8 C.A. Wright, A.R. Miller, and R.L. Marcus, Federal Practice and Procedure § 2024, at 343 (1994) (Wright & Miller), and the First Circuit has since adopted it. See *State* v. *United States Dep't of the Interior,* 298 F.3d 60, 68 (1st Cir. 2002).

[27]The commissioner does not dispute, and indeed assumes, that the test under the Massachusetts Rules of Civil Procedure should be the "because of" standard.

[28]The judge in the Superior Court appears to have employed a test less favorable to Comcast. In his discussion of the requirement that a document be prepared in "anticipation of litigation," the judge, citing Meszar *vs.* Horan, Worcester Superior Court Civ. Action No. 99-0788 B (Nov. 16, 1999), stated that the document must be "actually prepared in anticipation of some specific litigation," and that "the determinative question is whether the prospect of litigation was the primary motivating purpose behind the creation of the document." This closely mirrors the first test discussed in *Adlman II, supra* at 1198-1202, the "primarily to assist in litigation" test, that we have rejected. Because we are in as good a position as the motion judge to assess the evidence, which is entirely documentary, under the correct "because of" formulation, we need not remand the case to the Superior Court. Cf. *Adlman II, supra* at 1203-1204, quoting Wright & Miller, *supra* at 343 (remanding case to trial court "to reconsider the issue under the Wright & Miller test of whether 'the document can fairly be said to have been prepared . . . because of the prospect of litigation' ").

[29]The commissioner's reliance on In re Grand Jury Proceedings, U.S. Dist. Ct., No. M-11-189 (S.D.N.Y. Oct. 3, 2001), is misplaced. That case relied in turn on In re Derienzo, No. 5-96-01186 (Bankr. M.D. Pa. April 28, 1988),

strating a specific prospect of litigation." We disagree with the commissioner on both points. As *Adlman II, supra* at 1197, makes clear, a litigation analysis prepared so that a party can make an informed business decision is afforded the protections of the work product doctrine. In our own review of the circumstances of Andersen's retention, and on review of the Andersen memoranda, see *Adlman II, supra* at 1204, we conclude that the documents at issue "can fairly be said to have been prepared or obtained because of the prospect of litigation." Wright & Miller, *supra.* As Ottinger's affidavit makes clear, his concern focused on the reasonable possibility that the department would challenge any nonpayment of Massachusetts taxes in light of the substantial capital gains realized by US West on the divestment of the TCG shares. Thus, Ottinger requested the Andersen partners to discuss "the pros and cons of the various planning opportunities and the attendant litigation risks." What the Andersen partners gave Ottinger was an analysis prepared "in order to inform a business decision which turns on the party's assessment of the likely outcome of litigation expected to result from the transaction." *Adlman II, supra* at 1197.[30]

We have little doubt that US West had "the prospect of litigation in mind when it directed the preparation of the memorandum." *Id.* at 1204. We agree with the motion judge who noted that the Andersen memoranda are "a detailed analysis of Massachusetts tax law," and an outline of the "feasibility of the potential restructuring in light of applicable Massachusetts law and the potential for [department] litigation." Stated differently, the Andersen memoranda or their substantial equivalent would not have been prepared "irrespective of the prospect of litigation." *United States* v. *Textron Inc. & Subsidiaries,* 557 F.3d

where the court rejected a "blanket assertion" that work product protection should extend to "all the actions taken" to comply with the law. There has been no blanket assertion here. In addition, contrary to the commissioner's position here, the Derienzo court then distinguished and protected documents containing "legal analysis going to the heart of rendering legal opinions and advice to a client" under the attorney-client privilege, including "some of the documents authored by a non-attorney."

[30]The commissioner's "avoidance of litigation" test is unpersuasive for another reason: "there is no rule that bars application of work product protection to documents created prior to the event giving rise to litigation." *Adlman I, supra* at 1501.

87, 96 (1st Cir. 2009) (work product protects tax accrual workpapers where "function of the documents was to analyze litigation"). They were created "because of" the reasonable possibility of litigation with the department. See *Ward* v. *Peabody*, 380 Mass. 805, 817 (1980). See also Long-Term Capital Holdings *vs.* United States, U.S. Dist. Ct., No. 3:01 CV 1290 (JBA) (D. Conn. Oct. 30, 2002) (concluding that work product doctrine was applicable based on facts "remarkably similar" to those in *Adlman II*).

We also agree with the judge that the Andersen memoranda constitute opinion work product. The memoranda contain the "mental impressions, conclusions, opinions, or legal theories" of its authors, and the commissioner does not appear to contend otherwise. Mass. R. Civ. P. 26 (b) (3). Here, the commissioner has failed to meet her burden of demonstrating that these circumstances are so "extremely unusual" that they compel overcoming the greater protection afforded opinion work product. See Reporters' Notes, Mass. R. Civ. P. 26 (b) (3), Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 545 (LexisNexis 2008). Although the commissioner asserts in conclusory fashion that substantially equivalent information is not available elsewhere, she has not demonstrated that information about the business reasons for the reorganization of Continental Teleport is not available from US West officials. This is not the "singular" instance in which disclosure of opinion work product is warranted. See *Ward* v. *Peabody*, *supra* at 818.

4. *Conclusion.* For all of these reasons we conclude that the Andersen memoranda are protected from disclosure by the work product doctrine.

*Judgment affirmed.*