Neel, Stephen E., J.
This litigation arises out of improper option and margin trading by defendant Daniel Carpenter (Carpenter) of the plaintiffs’ monies held by Benistar Property Exchange Trust Co., Inc. (Benistar) in qualified intermediary escrow accounts pursuant to 26 U.S.C. §1031(a)(3). Beginning in 1998, Benistar deposited the funds in margin accounts at Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch or Merrill) and used the funds to engage in aggressive, high-risk uncovered option trading. Ultimately, Benistar lost more than $8 million of the plaintiffs’ money.[3] These consolidated actions followed.
Plaintiffs move for sanctions against Merrill and the law firm which defended it in the 2002jury trial in this case,[4] Bingham McCutchen LLP (Bingham), alleging that they engaged in a fraud on the court and other sanctionable behavior. Plaintiffs principally allege that Merrill and Bingham knowingly and intentionally withheld documents indicating that Merrill knew of Benistar’s wrongdoing. Plaintiffs also allege that Merrill, through and with the knowing assistance of Bingham, knowingly presented false and misleading testimony at the trial.
As a sanction for MerriH’s and Bingham’s alleged misconduct, plaintiffs seek a financial award of $120 million.
The Court conducted an evidentiary hearing on the motion from June 21 through June 30, 2010, and heard argument on July 17. After consideration of the testimony, exhibits, and other submissions by the parties, and for the reasons stated below, the motion will be denied.
FINDINGS OF FACT
The Court adopts (and does not repeat herein) the 334 numbered stipulated facts in the parties’ extensive “Revised Stipulated Facts for the Sanctions Proceeding,” with the exception of stipulated facts (SF) nos. 211,212, 213, 214, 234, 235, 236, 237, 243, 244, and 245.[5]
With regard to Merrill’s actions prior to Bingham’s first involvement in the matter in June 2001, the Court adopts herein the “Findings of Fact, Section I—Punitive Damages” set forth in its Memorandum and Order for Judgment on Plaintiffs’ Claims for Punitive and Consequential Damages, issued together with this Memorandum and Order on Plaintiffs’ Motion for Sanctions.
After considering the evidence and inferences reasonably drawn therefrom, the Court finds the following supplemental and additional facts.
I. Initial Involvement of Bingham
Merrill retained Bingham in connection with the Benistar matter on June 22, 2001, by which time the cases against Benistar and related entities had been pending for at most five months. Merrill was initially only a trustee defendant in the cases, which were ultimately consolidated. John R. Snyder (Snyder), an experienced Bingham trial partner and Merrill’s lead trial attorney, made diligent efforts to obtain paper and electronic records and other information from Merrill in response to discovery requests in the case.
Between July 2001 and February 2002, Snyder took steps to learn the relevant facts from the key individuals in Merrill’s Fifth Avenue branch: brokers Gary Stern and Gerald Levine (brokers), former administrative manager Thomas Rasmussen, and branch vice president Hassan Tabbah. Each told Snyder that he did not know that the money in Benistar’s accounts belonged to third parties; that on September 20, 2000, trading in the account was restricted to closing positions only, because of Benistar’s trading strategy and losses rather than any concern about the presence of third-party money in the accounts; and that he had not visited the § 1031 pages of the Benistar website. Stern, Levine, and Tabbah testified as much at depositions between October 2001 and February 2002.
II. The Malia Documents
Merrill’s in-house counsel assigned to manage the litigation was Joseph Pash, who continued in that role until August 2002. Pash handled some 300-500 cases per year of varying complexity; he hired outside counsel in about twenty percent of his cases.
On July 12, 2002, Snyder spoke with Pash, who reported a conversation he had had that day with Martin Malia, an options specialist in Merrill’s compliance department. Pash told Snyder that he had obtained Malia’s Benistar file (Malia file) and would send it to Snyder.
On July 15, 2002, Snyder received the Malia file. The file contained documents which Snyder had not seen before, including documents reflecting Malia’s actions on the morning of September 20, 2000. (At 10:34 a.m. that day, per Malia’s order, trading in the Benistar account was restricted to closing positions only.) The Malia file included website prints from Malia’s visit to the §1031 section of Benistar’s website on September 20, 2000. The Benistar website prints contain a question and answer section including the following: “3. Can I trust Benistar Property Exchange with my money? . . . [W]e protect your assets: we have accounts with major banking and investment firms— *20 accounts under our sole control, as required for these exchanges . . . Our accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner. We distribute funds only at your request.” Sanctions Hearing, Ex. 1140: 3026-3027.[6]
Thus, the Benistar website disclosed that Benistar handled other people’s money, and caused Malia to suspect that Benistar was trading other people’s money through its account at Merrill. This was concerning to Malia because of the losses in the account. Unlike the Benistar client escrow and exchange agreements which attorney David Patterson had mailed and faxed to Levine in October 1998 (SF 5), however, the Benistar website did not specify the kinds of investments which Benistar was obligated to employ while holding plaintiffs’ and others’ funds. Thus, the Benistar website did not inform Malia on September 20, 2000 that Carpenter’s options trading constituted a breach of Benistar’s duly to its §1031 clients.
The Malia file also included:
a fax from Malia to Rasmussen attaching the § 1031 pages of the website, sent at 11:04 a.m. September 20,2000.
an email from Tabbah on September 27, 2000, conveying a request from Malia that Stern and Levine send a letter, “Confidential to Counsel,” concerning their “knowledge about the client managing other people’s money.”
the brokers’ October 2, 2000 “Confidential to Counsel” memorandum, stating that, “[a]s far as we know [Carpenter’s] major source of business is: estate planning, insurance, pension management and real estate transactions. We have been under the assumption that the money he has been investing has been his own.”
a Dun & Bradstreet report, printed on September 29, 2000, concerning a separate company listing Carpenter as chairman.
an email from PaineWebber to Modesto Moya of Merrill’s anti-money laundering unit, dated January 2, 2001, reflecting PaineWebber’s communications to Merrill about Benistar accounts.
printouts of Benistar account information, evidently made by Moya on January 4, 2001.
Snyder reviewed the file the day he received it; he thought that some of the documents in it might be protected as attorney-client or work-product material. He prepared questions for an interview with Malia, whom he telephoned that day. The questions included: what prompted each printout of the website; what was the extent of any attorney involvement in the matter; had the brokers seen the website’s §1031 portion; what had prompted Malia’s request to Tabbah for the brokers’ letter regarding what they knew about the client’s managing other people’s money; what did Tabbah and Rasmussen know about that; why was the Benistar account shut down, and by whose decision. Snyder did not plan to ask Malia in so many words whether he had prepared the documents “in anticipation of litigation” because he understood that Malia was not a lawyer and did not want to put words in his mouth, and because Snyder wanted to know more directly what Malia had done and why.
Snyder telephoned Malia the same day, July 15. He asked Malia about the sequence of events that led to the September 20,2000 restriction to closing positions only. Malia told him that, at the request of Jennifer Waddington, who worked in the private client compliance department surveillance unit, he had assessed the Benistar account and had determined that Benistar’s strategy was not working and would have to be stopped.
Malia next told Snyder that he had done an internet search before the decision to shut the account down. He said that he had seen, on a question and answer page of the Benistar website, “can you trust Benistar with your money.” Sanctions Hearing Tr. 6:45-46.[7] Malia said that that information gave him some suspicion of embezzlement; he said, during that conversation or a later one, that if he had known that it was embezzlement, he would have shut the account down and turned the matter over to the authorities.
During the July 15, 2002 telephone call Malia also discussed with Snyder working with lawyers in September 2000, specifically Kevin Duffy, an in-house lawyer with the office of General Counsel (OGC) who had become involved following Carpenter’s September 22 letter protesting the restriction on Benistar’s account. Malia had received a copy of the letter from Rasmussen, and was aware that it had been referred to Merrill’s in-house litigation counsel. Malia said that he may have notified Barry Mandell, whom he knew to be fairly high up in the OGC.
Malia told Snyder that in September 2000 he reported to Dennis Pape, an attorney working as a compliance supervisor at Merrill.
Snyder followed up his conversation with Malia by interviewing Kevin Duffy and Modesto Moya; he also conducted two additional interviews with Malia.
III. The Privilege Determination; Whether to Call Malia as a Trial Witness
Snyder had several discussions with Merrill in-house lawyers about whether Malia’s file was protected from disclosure by the work product doctrine or the attorney-client privilege.
On July 23, 2002, he spoke with Pash, and their discussion included whether the documents should be produced even if protected. They discussed the fact that Malia operated under the “umbrella” of the OGC, that he acted on occasion when litigation was anticipated, and that he was generally directed by attorneys. Ex. 1005: 00035. Pash expressed his view that the Malia documents were protected work product, and *21 that the brokers’ October 2, 2000 memo to counsel was privileged. By the end of their conversation, based on additional information from Pash, Snyder had come to the same conclusion.
The specific information upon which Snyder based his conclusion, as of July 23, 2002, included the following (see Snyder’s testimony, Tr. 6:58-61):
Malia was under the OGC
Malia was in general directed by attorneys
apart from his role as an options specialist, Malia occasionally acted in anticipation of litigation or other legal problems
a number of the documents in the Malia file reflected actions taken after Malia made the decision to restrict the Benistar account, including a request for a memo to counsel, and a document from January 2001 reflecting communication with PaineW-ebber at the time the Benistar strategy ended or was terminated by PaineWebber
Malia’s statement that he was working in connection with risk management or reacting to a problem account
Carpenter’s September 22, 2000 letter threatening litigation over the account’s restriction
Malia’s understanding that Carpenter’s September 22 letter had been referred to litigation, and that he may himself have referred it to Mandell
Malia’s direct reporting relationship to Pape, an attorney working as a compliance department supervisor
Malia’s interaction with Duffy of OGC in September 2000
the result that anticipation of litigation in September 2000 had proved accurate
Snyder and Pash came to no final decision about withholding the Malia documents as work product during their July 23, 2002 conversation; they did discuss calling Malia as a witness, and recognized that doing so would likely lead to the production of his file.
On September 13, 2002, Snyder met with Merrill’s in-house lawyers to discuss the status of the case and strategy in advance of the upcoming November 14 jury trial. Present were Pash, Joseph Hanczor, who was taking over the case from Pash,[8] and Sid Pandolfo and Scott Bieler of Merrill’s litigation department (Bieler was head of litigation for the private client group). Snyder presented a letter of that date describing the litigation, and referring to Malia’s visit to the Benistar website and the §1031 pages.
Snyder raised at the meeting, among other items on his agenda, the question whether the Malia website visit could be protected from disclosure as privileged or work product. He does not recall the discussion. He does recall, however, that Hanczor agreed that Merrill should claim work product protection with regard to the Malia documents, and that if Snyder decided to call Malia as a witness at trial, Merrill would waive the work product protection related to his actions. Snyder was considering at the time whether Malia would be a useful witness; if called, Malia could explain options trading strategies, and respond to Carpenter’s arguments, in his September 2000 letters to Merrill, that he could have made money trading on SDLI options. Such testimony might have been useful to rebut Benistar’s argument that the eventual crisis would have been averted if Merrill had just let Carpenter continue to trade.
Snyder continued to discuss, principally with Hanczor, whether to call Malia as a witness. Ultimately, Snyder’s view on what would have been the effect of the Malia documents at trial was that
... it was evidence that related to the very end of the relationship with Mr. Carpenter. In other words, the trading was over, the accounts were going elsewhere, this piece of evidence would relate only to events after that and so ... I would have to say ... that I viewed it as another piece of evidence but not one that was particularly telling or harmful . . . [T]hat evidence would not get you to the actual knowledge that needed to be proved in order to establish aiding and abetting liability, because at most it would establish knowledge of the business of Benistar but not that the funds in the account were third-party money or that the funds in the account, if they were third-party money, were being traded wrongfully; all of which needed to be proved.
Tr. 6:126-127.
Shortly before or at the beginning of trial in November 2002, Snyder and Hanczor decided not to call Malia as a witness. They did so because they “determined early that we didn’t need him, and because the court was concerned about the length of the trial and was pressing us as to only putting on what we really needed in order to prove the case.” Tr. 6: 128.
Ultimately, Bingham’s and Merrill’s reasons for withholding the Malia documents (in addition to those underlying Snyder’s conclusion on July 23, set out above) included the following:
Snyder had prior experience with options matters, on the basis of which he understood that Malia’s core function as an options compliance officer was to perform technical mathematical analyses of options trading. Malia’s file, and his statements to Snyder, disclosed Malia’s taking initiative to act outside his core function, including visits to the Benistar website, requesting a "confidential to counsel” letter from the brokers, retaining a copy of that letter in his file, obtaining a Dun & Bradstreet report on a Carpenter-related entity on September 29, 2000, and collecting documents from Modesto Moya in January 2001, after Benistar had acknowledged it had been trading other people’s money.
*22 Snyder understood that Malia’s position in options compliance fell under the umbrella of OGC, and that Malia was in a position to recognize threatened litigation and to act on that recognition.
Despite Malia’s varying accounts to Snyder of the timing of his visit to the website and his decision to restrict the Benistar account on the morning of September 20, 2000, and after gathering other information about the events of that day, Snyder ultimately concluded that Malia had generated the Malia documents after he decided to restrict trading in the account, i.e., after his routine options compliance activities had ended. Tr. 6:194.
When Snyder first examined the Malia file, he saw documents which pre-dated September 20, 2000. While he knew or assumed that at least some of those documents had been, or should have been, previously produced to plaintiffs in discovery (e.g., the standard option agreement which Carpenter signed in connection with one of the Benistar accounts), he may not have been as diligent as he should have been in asking Malia about why those documents were in his file, nor in determining specifically which had or had not been produced.[9] Rather, Snyder was focusing on the documents he had not seen, and which Malia had generated or caused to be generated after September 20, 2000. He assumed that “the underlying account documentation had all been produced and this merely reflected what was on that documentation.” Tr. 6-114. His understanding was that Malia had put together the file as a result of his focus on the Benistar accounts on and after September 20. See Tr. 6:112-121.
IV.Merrill’s Emergency Motion to Reconsider
On June 19, 2002, the trial judge (Botsford, J.), granted plaintiffs’ emergency motion to compel evidence of visits by Merrill employees to the Benistar website. On June 22, Merrill filed a motion for reconsideration, stating that “[a]s of June 20, 2002, despite a diligent search, no non-privileged documents have been found within the possession, custody or control of Merrill Lynch concerning ‘visits made by Merrill personnel to the benistar.com website.’ Merrill Lynch continues to search for any non-privileged responsive documents, and . .. will produce any such documents located within the possession, custody or control of Merrill Lynch.” Ex. 1776, at 01014; SF 84-85.
At the time he filed Merrill’s motion for reconsideration, Snyder reasonably believed that the statements therein, quoted above, were true.
V.The Decision Not to Supplement Interrogatory Answers
On June 13, 2002, before Snyder received the Malia file from Pash, Bingham served Merrill’s answers to interrogatories. The answers correctly reflected Bingham’s and Merrill’s understanding of the events addressed, and named Malia as an individual with knowledge of the reasons for restricting or stopping trading in the Benistar accounts. Ex. 1029: answer to interrogatory 21. The answers objected to producing any information which was privileged or work product.
In October 2002, prior to any final decision on whether to call Malia as a witness, Bingham drafted supplements to several of Merrill’s interrogatory answers which, in answer to interrogatories concerning Merrill’s knowledge of Benistar’s business and website visits, would have disclosed information about Malia’s visits to the Benistar website, and what he viewed on the site. Ultimately Snyder decided not to serve the draft supplemental answers because he believed that “the information was protected by the Work Product Doctrine and we decided not to call Mr. Malia. That being the case, we did not produce the documents; we did not produce the work product protected information.” Tr. 6-93.
Nor did Snyder consider causing Merrill to supplement its answers to interrogatories concerning Merrill’s belief “that all the funds held in the Benistar Accounts were the property of Benistar.” Ex. 1029: answer to interrogatory 12. This was so because, as late as a November 8,2002, conference with Snyder and Hanczor, Malia reported that he was suspicious about the source of the funds in the account and thought that there was a “possibility” that the money in the account was exchange money belonging to others, but “never concluded” that the Benistar account held third-party funds. Ex. 1005: 00018. Moreover, while Malia’s accounts of the sequence of events was not consistent in his conversations with Snyder, he consistently stated that his decision to restrict trading in Benistar’s account was based on Benistar’s losses and trading strategy. Moya’s statements to Snyder that he “thought” the transactions in the Benistar account “must be §1031 exchanges,” Ex. 1005: 00023, did not persuade Snyder otherwise, because his investigation led him to believe, in good faith, that Moya’s involvement was after the fact, and not sufficiently informed to constitute either a statement of, or the fact of, the requisite “knowledge” on Merrill’s behalf. Nor did Snyder believe that Steve Snyder (Merrill’s vice president in charge of compliance and surveillance) offered any additional pertinent information regarding the grounds for restricting Benistar’s trading.
VI.Plaintiffs’ Motion to Compel Malia’s Deposition
Between April and July 2002 plaintiffs asserted additional claims against Merrill. On August 15 the Court consolidated the claims for a November trial. On September 3, 2002, one plaintiffs attorney requested that Merrill produce Malia and four other Merrill employees for depositions. Merrill refused on the ground that discovery following the consolidation, and two months before trial, was untimely, and, ruling on plaintiffs’ motion to compel, the Court agreed.
VII.The 2002 Trial
Snyder did not knowingly elicit false testimony from Merrill witnesses at the 2002 trial. He presented in *23 good faith a defense focusing on his understanding that Merrill lacked actual knowledge that Benistar was trading third-party money in violation of its obligations to the plaintiffs. He examined Merrill’s witnesses and reasonably believed that they were testifying truthfully.
Snyder did not show Rasmussen, Stern, Levine, or Tabbah the email chain, initiated by Malia’s request, requesting the brokers’ “confidential to counsel” memo, or the memo itself, to refresh their memories, because he was concerned that to do so would risk waiving the work product protection. He did show them the §1031 pages from the website which he believed that plaintiffs would be asking them about; none recalled having seen the pages. He specifically asked Rasmussen whether he recalled receiving a fax from Malia concerning the website; Rasmussen said that he had no recollection of that. See Tr. 6-131-137.
Attorney Richard Renehan, called by Bingham as an expert witness, testified that it was reasonable for Snyder to be concerned that if he disclosed any part of the Malia file, he might be waiving work product protection. The Court credits attorney Renehan’s opinion.
The Court credits also attorney Renehan’s opinion that good practice does not require an attorney to correct a witness on the stand unless the attorney has “actual knowledge, based on compelling factual evidence, that what the witness has said is not true.” Tr. 7-83-84. To the extent that Snyder confronted a Merrill witness who gave a different version at trial than he had given earlier, Snyder had no such actual knowledge, and was not required at trial to correct the witness.
VIII. The 2009 Disclosure of the Malia File
The Court concludes that Snyder acted in good faith, according to the best of his recollection, as events unfolded following discovery of the branch file in administrative manager Anna Roccanova’s office at the Fifth Avenue Branch. The Court is satisfied that the non-disclosure of the Malia documents until 2009 was not the result of any fraud on the court, and that Merrill and Bingham alerted the Court as soon as those documents came to light. Merrill’s and Bingham’s thorough investigation of those events, tested by plaintiffs at the evidentiary hearing in this case, persuades the Court that inadvertence, not design, lay behind the absence of the Malia file.
RULINGS OF LAW
Plaintiffs move for sanctions against Merrill and Bingham on four grounds: fraud on the court; Mass.R.Civ.P. 11; G.L.c. 231, §6F; and G.L.c. 93A.[10]
I. Fraud on the Court A. Elements and Standard of Proof
The Supreme Judicial Court set out in Rockdale Management Co., Inc. v. Shawmut Bank, N.A., 418 Mass. 596 (1994), what a party must prove to establish that another has committed a fraud on the court:
A “fraud on the court” occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party’s claim or defense.
Id. at 598 (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir. 1989)). As noted in the quoted language, plaintiffs bear the burden of proving a fraud on the court by clear and convincing evidence.
More recently, the Supreme Judicial Court has stated that the doctrine of fraud on the court is
limited to “that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner . . .” “Courts have found fraud upon the court only where there has been the most egregious conduct involving a corruption of the judicial process itself. Examples are bribery of judges, employment of counsel to ‘influence’ the court, bribery of the jury, and the involvement of an attorney (an officer of the court) in the perpetration of fraud.”
Wojcicki v. Caragher, 447 Mass. 200, 210 (citations omitted).
While deciding whether a fraud on the court has been committed is a “case-by-case, fact-specific determination,” Rockdale, at 599, the court in that case offered, as guidance to trial courts, examples of such conduct: “creating and presenting false evidence in support of a claim or defense, . . . destroying evidence and otherwise impeding the discovery process, . . . offering false and misleading testimony, . .. and falsifying past deposition testimony.” Id. at 599-600 (citations omitted).
More recent examples are set out in Comm. of Probation v. Adams, 65 Mass.App.Ct. 725, 729 (2006) (party filed affidavits that contained falsehoods, falsely complained of defendant attorney to Board of Bar Overseers, violated law requiring disclosure when seeking restraining order); Munshani v. Signal Lake Venture Fund II, LP, 60 Mass.App.Ct. 714, 720 (2004) (plaintiff fabricated evidence in the form of an email, which he caused his lawyer to submit in successful opposition to a motion to dismiss his companion Federal action, and to submit to Federal and State courts an affidavit attesting to email’s authenticity; when defendants’ expert asserted the email was fraudulent, plaintiff not only denied the accusation, but invited the court to appoint an independent expert to determine the matter).
Fraud on the court has been found in cases “where a party has perjured him or herself to the court and *24 the court has relied upon the fabrications when reaching a judgment.” Comm. of Probation v. Adams, at 730. Cf. Wojcicki v. Caragher, at 210 (“even ‘[p]eijuiy does not constitute “fraud upon the court” ’ when there is no evidence that the judicial process itself was corrupted”) (citations omitted). Nor is there fraud upon the court “where a judgment has been ‘obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjuiy.’ ” Artco, Inc. v. DiFruscia, 5 Mass.App.Ct. 513, 518 (1977) (citation omitted).
An unpublished Appeals Court decision, Site, Inc. v. Peabody Constr. Co., Inc., 70 Mass.App.Ct. 1101 (2007), 2007 Mass.App. LEXIS 950, provides an example of conduct found not to rise to the level of fraud on the court. In that case, where there was no evidence that a missing “crucial” document had been “purposefully hidden,” the Appeals Court found no fraud “to the point of corruption of the judicial process.” Id.
B. Bingham’s and Merrill’s Work Product Determination
The primary question presented by plaintiffs’ motion for sanctions in this case is whether, by failing to produce the Malia documents under claim of work product protection, and to disclose the information in those documents in pretrial proceedings and at trial, Merrill and Bingham committed a fraud on the court. Analysis of that question requires discussion of the protection from discovery which Mass.R.Civ.P. 26(b)(3) affords “documents and tangible things . . . prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party’s representative (including his attorney, consultant, ... or agent) ...”
The Court first considers whether Bingham (i.e., Snyder) and Merrill had a reasonable and good faith basis in law upon which to decide to withhold the Malia file as work product, whether or not that decision was ultimately correct. In light of the Court’s findings herein, and the law of Massachusetts regarding work product, the Court concludes that they did.
In Comm. of Revenue v. Comcast Corp., 453 Mass. 293 (2009), the court reviewed two tests that have developed as to documents that, “although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of the litigation.” Id., at 316.
The first test is “whether the documents are prepared primarily or exclusively to assist in litigation—a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision.” Id. (citation and quotation marks omitted). The second is “whether the documents were prepared because of existing or expected litigation—-a formulation that would include such documents, despite the fact that their purpose is not to assist in litigation.” Id. (citation and quotation marks omitted).
The court concludes that the latter test is “consistent with our own jurisprudence.” Id. at 317. Thus, documents are work product if they “can fairly be said to have been prepared or obtained because of the prospect of litigation.” Comm. of Revenue, at 318 (emphasis supplied), quoting 8 C.A. Wright, A.R. Miller, Federal Practice and Procedure §2024, at 343 (1994) (Wright & Miller). Here, in light of the Court’s findings regarding Snyder’s investigation of the provenance of the Malia documents (including those documents Malia obtained), and the factors which Snyder considered in making his determination that they were work product, the Court concludes that Snyder, and Merrill, had an adequate basis upon which to make that determination.[11]
The Court next considers Snyder’s concern that calling Malia as a witness, and refreshing the memories of Rasmussen, Tabbah, Levine, and Stern with the Malia documents, risked waiving the work product protection for those documents. Based upon the findings above, attorney Renehan’s testimony, and the law, the Court concludes that Snyder’s concern was valid, and that his decision not to call Malia, or to show the Malia documents to the other witnesses, was made in good faith, and not for the purpose of perpetrating a fraud on the Court. See Commonwealth v. O’Brien, 419 Mass. 470, 478-79 (1995) (trial court properly required disclosure of attorney’s notes used to refresh witness’s recollection); Robert Haig, ed., 2 Business and Commercial Litigation in Federal Courts 8709 (2d ed. 2005) (certain courts view any materials reviewed by the witness during a prep session as producible).
C. Snyder’s Compliance with Mass.RProf.C. 3.3
Bingham argues that, contrary to plaintiffs’ contention, Snyder conducted pretrial proceedings and the trial in accordance with his responsibilities under Mass.R.Prof.C. 3.3. That rule provides, in part:
(a) A lawyer shall not knowingly:
(4) offer evidence that the lawyer knows to be false, except as provided in Rule 3.3(e). If a lawyer has offered, or the lawyer’s client or witnesses testifying on behalf of the client have given, material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures.
(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
As Bingham points out in its Post-Trial Memorandum, at 23, under the definition section of the Rules the terms “knowingly,” “known,” or “knows" “denote! 1 actual knowledge of the fact in question.” Mass.R.Prof.C. 9.1(f) (emphasis supplied). “Belief’ or “believes,” on the other hand, denote “that the person involved actually supposed the fact in question to be true.” Id., Rule 9.1(b). Both definitions provide that a person’s knowledge or belief may be inferred from circumstances.
*25 The comment to Rule 3.3 states that “[t]he advocate’s task is to present the client’s case with persuasive force. Performance of that duly while maintaining confidences of the client is qualified by the advocate’s duty of candor to the tribunal. However, an advocate does not vouch for the evidence submitted in a cause; the tribunal is responsible for assessing its probative value.”
Thus, under the Rules, a lawyer must not offer evidence he knows is false, but may offer evidence he reasonably believes is false. Largely for the reasons set out in Bingham’s Post-Trial Memorandum, at 24-31, the Court concludes that Snyder’s conduct did not fall on the wrong side of the line drawn by Rule 3.3.
D. The Malia Documents as Evidence of Actual Knowledge
As noted above, there is no fraud upon the court “where a judgment has been obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of peijuiy.” Artco, Inc. v. DiFruscia, at 518. Even if peijury is apparent, there will be no finding of fraud on the court unless the court “has relied upon the fabrications when reaching a judgment.” Comm. of Probation v. Adams, at 730. Here, where peijuiy at the 2002 trial is alleged but not proved, it is nevertheless useful to consider the extent to which omissions of matters disclosed in the Malia documents may have affected the outcome.
On their claims against Merrill for aiding and abetting Benistar’s breach of fiduciaiy duty and conversion, under the applicable New York law plaintiffs were required to prove that Merrill had “actual knowledge” of Benistar’s wrongdoing. Cahaly v. Benistar Prop. Exch., 451 Mass. at 351-52. At the 2002 trial, there was “no evidence” that the funds in the Benistar account “were third-party funds contractually required to be held in escrow and that Benistar Trust’s agreements with the third parties did not permit using the funds for speculative trading.” Id. at 353. Even assuming that Carpenter’s September 22, 2000 letter “signified that Benistar Trust had some unspecified fiduciaiy duty to third-party clients relevant to the corporate accounts, the ‘relevant knowledge’ for liability to attach ... is knowledge as to the primary violator’s status as a fiduciaiy and knowledge that the primary’s conduct contravenes a fiduciaiy duly’ (emphasis added).” Id. (citation omitted).
One issue raised by the present motion is the extent to which the Malia documents constitute evidence of Merrill’s actual knowledge. The court in Cahaly considered and rejected plaintiffs’ argument that testimony of several Merrill employees “that they viewed the Benistar Web site homepage” supported the juiy’s finding of actual knowledge, on the basis that the web pages viewed did not contain a description of Benistar’s business and had nothing to do with §1031 exchanges. Id., at 356. Moreover, the court noted, the witnesses “denied seeing any information on the Web site concerning Benistar Trust’s role as a qualified intermediaiy for §1031 plans.” Id., n. 30.
Because the record did not contain the Benistar web pages viewed and copied by Malia on September 20, the court obviously did not go on to address what information Merrill would have learned from those pages, and the extent to which such information is evidence of actual knowledge. While those pages, presented at the 2009 trial, describe Benistar’s business and refer to §1031 exchanges, they do not specifically disclose that the funds in Benistar’s account “were third-party funds contractually required to be held in escrow and that Benistar Trust’s agreements with the third parties did not permit using the funds for speculative trading.” Id. at 353. Thus, while the Benistar website pages which Malia viewed (and other Malia documents) provided circumstantial evidence at the 2009 retrial that was not available to the juiy at the 2002 trial, they are not direct evidence of actual knowledge as defined by the Supreme Judicial Court in Cahaly, and, even combined with other circumstantial evidence, do not satisfy the “crucial” evidentiary requirement set forth in Cahaly:
The indirect, circumstantial evidence amassed at [the 2002] trial may suggest that Merrill Lynch knew the nature of Benistar Trust’s business. But it does not erase the evidentiaiy lacunae between Merrill Lynch’s knowledge of Benistar Trust’s services and knowledge that Benistar Trust was violating its fiduciary agreements to clients and converting client funds by trading in the Benistar Trust corporate account. Crucially, no evidence of Merrill Lynch’s actual knowledge of Benistar's agreements with its clients was presented at tried.
Id. at 356-57 (emphasis added).
While the Malia documents (and particularly references therein to Benistar’s handling of §1031 exchanges) certainly added to Merrill’s knowledge of Benistar’s business, and were in evidence at the 2009 trial, the only evidence at the latter trial of the “crucial” element of Merrill’s actual knowledge was and remains the so-called Patterson documents, sent to Merrill in October 1998. Those documents, comprising copies of the escrow agreement and exchange agreement that Patterson’s client had signed with Benistar, were also in evidence at the 2009 trial, and indisputably provide evidence of Merrill’s actual knowledge of Benistar’s fiduciaiy obligations and breach thereof. A primary question for the juiy in that trial was whether Levine received and understood the documents which Patterson had sent; the evidence amply supported a finding that he did.
In short, the Malia documents provided evidence that on September 20, 2000, at the very end of Carpenter’s trading in Benistar’s Merrill account (and before Merrill handed the account off to PaineWebber), Merrill became aware of the nature of Benistar’s busi *26 ness, and that Benistar handled §1031 funds for its clients. The Malia documents also support the inference that Malia and others at Merrill were suspicious that Benistar was trading clients’ money without authorization. What the Malia documents did not provide was evidence that Merrill had “actual knowledge of Benistar’s agreements with its clients . . .” Id. The Patterson documents evidence Merrill’s direct knowledge of those agreements from the time Benistar established its Merrill account in October 1998. Even assuming that the Malia documents were not work product and should have been produced, Merrill’s and Bingham’s failure to produce them before the 2002 trial was far less important to the outcome than was the effect of the absent Patterson documents.
On the basis of the above findings of fact and rulings of law, the Court concludes that plaintiffs have not demonstrated, by clear and convincing evidence, that Bingham or Merrill perpetrated a fraud on the Court.
II. Remaining Grounds for Sanctions
The foregoing effectively denies plaintiffs the findings and rulings necessary to support any of their remaining theories for imposition of sanctions.
Rule 11 (a) provides that “the signature of an attorney to a pleading constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is a good ground to support it; and that it is not interposed for delay.” The Court having found that attorney Snyder acted in good faith and not in the commission of any fraud on the Court, plaintiffs have not established a Rule 11 violation against him or Bingham.
General Laws c. 231, §6F provides for award of enhanced interest and reasonable attorneys fees upon a court’s determination that “substantially all of the . . . defenses . . . whether of a factual, legal or mixed nature, made by a party who was represented by counsel during most or all of the proceedings, were wholly insubstantial, frivolous and not advanced in good faith.” In light of the foregoing, plaintiffs have failed to demonstrate that “substantially all of the . . . defenses” put forward by Merrill were “wholly insubstantial, frivolous and not advanced in good faith.”
Although attorney misconduct can give rise to multiple damages and attorneys fees under G.L.c. 93A, see Hug v. Gargano & Assocs., P.C., 76 Mass.App.Ct. 520, 526-28 (2010), recovery under c. 93A is not appropriate here where (1) no claim under that statute has been commenced against Bingham, and (2) in any event, the Court’s findings of fact do not support a finding that either Bingham or Merrill[12] engaged in unfair or deceptive conduct.
To the extent that the parties’ respective proposed findings of fact and rulings of law are inconsistent with the foregoing, they are denied.
ORDER
For the reasons stated above, plaintiffs’ Motion for Sanctions is DENIED.

In 2000, the funds were transferred to similar accounts at UBS PaineWebber, Inc.

The 2002 jury trial was Phase I of this trifurcated case. The jury found the defendants Benistar, Carpenter and his wife Molly Carpenter liable on a variety of common-law claims. The jury also found Merrill liable for aiding and abetting conversion, aiding and abetting a breach of fiduciary duty, and violating the New York and Connecticut consumer protection statutes. The trial judge allowed Merrill’s motion for judgment n.o.v., finding insufficient evidence that Merrill had actual knowledge of the Benistar defendants’ wrongdoing. Subsequently, the judge allowed the plaintiffs’ motion for a new trial against Merrill on the basis of newly discovered evidence; the Appeals Court and the Supreme Judicial Court affirmed her decision. See Cahaly v. Benistar Prop. Exch. Trust Co., 69 Mass.App.Ct. 668 (2007); Cahaly v. Benistar Prop. Exch. Trust Co., 451 Mass. 343, 369 (2008). Following a trial before this Court m June 2009, a jury found for the plaintiffs on all of their claims against Merrill.

The listed stipulated facts are those as to which the Court sustains objections of relevance lodged by Merrill, Bingham, or both.

 Hereafter, citations to hearing exhibits are indicated thus: “Ex. X:_.”

Hereafter, citations to the hearing transcript are indicated thus: ‘Tr. x:_’’

Pash had left to join Merrill’s “Six Sigma” program in August 2002.

hrhat is not to say that Snyder’s determination not to produce any of the documents in the Malia file, in order to preserve work product protection, was not reasonable; see testimony of attorney Richard Renehan, Tr. 7:107-108. Rather, Snyder was less than diligent to the extent that he saw documents in the Malia file which existed elsewhere in Merrill’s records and had not been produced, and failed to produce them.

Plaintiffs also rely on the inherent power of the Court to award sanctions for the acts they allege Merrill and Bingham to have committed. Because the considerations underlying the Court’s inherent power align with those underlying plaintiffs theory of fraud on the court, the Court does not treat them separately.

In the context of the present motion, and in view of the production and admission of the Malia documents at the 2009 trial, the Court makes no ruling as to whether the work product determination was correct.

Merrill's conduct supporting an award of punitive damages is addressed separately, see Memorandum and Order for Judgment on Plaintiffs’ Claims for Punitive and Consequential Damages, and does not support plaintiffs’ allegations in support of their motion for sanctions.