# United States Court of Appeals
## For the First Circuit

Nos. 09-1470
     09-1494
     09-1589

VICOR CORPORATION,

Plaintiff, Appellee/Cross-Appellant,

v.

VIGILANT INSURANCE COMPANY; FEDERAL INSURANCE COMPANY;
CONTINENTAL CASUALTY COMPANY,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lipez, Circuit Judge,
Souter,[*] Associate Justice,
and Howard, Circuit Judge.

Bruce E. Falby, with whom Bruce S. Barnett and DLA Piper LLP were on brief, for appellants, Vigilant Insurance Company & Federal Insurance Company.
Matthew J. Lodge, with whom Christopher R. Carroll and Carroll McNulty & Kull LLC were on brief, for appellant, Continental Casualty Company.
Kevin J. O'Connor, with whom Peter C. Netburn, Matthew C. Kalin, and Hermes, Netburn, O'Connor & Spearing, P.C. were on brief for appellee.

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

March 16, 2012

**HOWARD**, <u>Circuit Judge</u>.  This insurance coverage dispute concerning the scope of a "loss of use" provision stems from wireless communication network outages in 2003.  The outages were traced to the failure of a component part, known as a power converter, manufactured by appellee/cross-appellant Vicor Corporation and sold to Ericsson Wireless Communications, which incorporated the power converter into radio base stations ("RBS") critical to Ericsson's customers' wireless networks.  In May 2004, as a result of the network failures, Ericsson sued Vicor in California state court.  They settled this suit ("the Ericsson litigation") in 2007 for $50 million.  Appellant/cross-appellees Vigilant Insurance Company and Federal Insurance Company, two of Vicor's liability insurers, paid $13 million of the settlement.  Vicor contributed the remaining $37 million.

Vicor subsequently initiated this litigation, seeking indemnification from its insurers for the $37 million of its own funds that it paid to Ericsson.  In addition to Federal and Vigilant, Vicor also sued an excess carrier, appellant/cross-appellee Continental Casualty Company (collectively "the insurers").  After eight days of trial, a jury awarded Vicor $17.3 million.  The district court granted the insurers partial post-trial relief, reducing the verdict by $4 million and entering judgment for Vicor in the amount of $13.3 million plus interest.  All parties filed timely appeals and cross-appeals raising multiple

issues.  For the reasons that follow, we believe that the judgment cannot withstand appellate scrutiny, and we remand the case.

## I.  Background Facts[1]

A.  Equipment and Failure

Vicor is a manufacturer of electronic equipment.  The Vicor power converters at issue in this litigation break down input power supplies into power levels needed by various other component parts.  Ericsson's business includes the design, manufacture and sale of electronic equipment, including radio base stations, which are used to set up and operate cellular telephone towers and networks.  Ericsson purchased Vicor power converters for use in Ericsson RBSs, which Ericsson sold to wireless communication providers worldwide.  These providers included Cricket Communications, which operated in North America, and China Unicom ("CU") which operated in several Chinese provinces.

Trial testimony suggested that power converters that Vicor had sold to Ericsson began failing in October 2002 and that Vicor became aware in May 2003 that some of these failures were related to a manufacturing change in a component computer chip.  In October 2003, severe outages occurred in the Cricket network.[2] Later in 2003, similar problems arose in CU's network in China.

---

[1]The facts set forth in this opinion are undisputed unless otherwise noted.

[2]Testimony placed the outages in Idaho, Oregon and Washington.

-4-

## B. Ericsson's Payments

As a result of the network outages triggered by the RBS failures, Ericsson provided compensation to both Cricket and CU. The record reflects that Ericsson paid approximately $9.3 million to Cricket pursuant to a settlement agreement. Additionally, Ericsson spent $5 to $6 million to repair the Vicor products purchased by CU and provided CU with $3.3 million in free equipment.

## C. The Ericsson Lawsuit

In May 2004, Ericsson sued Vicor on several theories of liability, including breach of contract, breach of warranty, negligence, unfair competition, misrepresentation and fraud. In a February 7, 2007 memo, Vicor's defense counsel summarized Ericsson's damage claim, as set forth in its interrogatory answers. The claim totaled approximately $1.1 billion, including the following: $1 billion in lost profits; $33 million to retrofit and replace Vicor power converters worldwide; $10 million of inventory provided to Cricket; $9.5 million settlement paid to Cricket; $7.5 million paid to CU; $3.3 million of inventory provided to CU; $5 million in costs for engineers and technicians to address failures and retrofit components; $2-3 million to diagnose defects and redesign RBS components to eliminate the Vicor product.

Vicor and Ericsson successfully resolved their differences through mediation, settling the Ericsson litigation for

$50 million.  Vigilant and Federal  contributed almost $13 million towards the settlement under two different types of policies. Vicor supplied the remaining funds.

## D.  Vicor's Lawsuit

After settling with Ericsson, Vicor filed this action against the insurers in Massachusetts federal district court, seeking reimbursement of the $37 million it had paid to Ericsson. Vicor sought a declaratory judgment that its payments were covered losses under the policies, as well as seeking damages for breach of contract.

## II.  The Insurance Policies

## A.  Vigilant and Federal

As relevant to this litigation, Vigilant issued two primary general liability policies to Vicor, spanning the terms October 1, 2002 to October 1, 2003, and October 1, 2003 to October 1, 2004.  Each policy was subject to general liability limits of $1 million per occurrence and $2 million aggregate.  In addition to the general liability coverage, the Vigilant policies insured against Information and Network Technology Errors or Omissions ("E&O coverage"), providing liability coverage for "financial injury" caused by a "wrongful act," as defined by the policy.  The E&O coverage was subject to a $10 million policy limit.

Federal issued two excess and umbrella general liability policies covering the same policy periods.  The 2002-2003 policy

contained a general liability limit of $20 million per occurrence and in the aggregate. The 2003-2004 policy contained a $12 million limit per occurrence and in the aggregate.

B.  Continental

Continental issued an excess liability policy with an $8 million limit to Vicor covering October 1, 2003 to October 1, 2004. The Continental policy is excess to the $13 million dollars in coverage provided by the Vigilant and Federal policies covering the same time period. As an excess policy, the Continental policy only provides coverage if a covered loss during the policy period exceeds the combined Vigilant-Federal limit.

C.  Policy Provisions

The Federal and Continental policies incorporate by reference many of the relevant policy provisions contained in the Vigilant policy, which provides, in relevant part:

> Subject to all the terms and conditions of this insurance, we will pay damages that the insured becomes legally obligated to pay by reason of liability:
>
> •       imposed by law . . .
>
> for bodily injury or property damage caused by an occurrence to which this coverage applies.
>
> This coverage applies only to such bodily injury or property damage that occurs during the policy period . . . .
>
>                  . . . .
>
> Occurrence means an accident, including continuous or repeated exposure to

substantially the same general harmful conditions.

Property damage means:

- physical injury to tangible property, including resulting loss of use of that property . . .

- loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

### III. Trial

The crux of the dispute in this case concerns the policy language addressing coverage for "loss of use of property that is not physically injured." Of the money contributed by Vigilant and Federal to the Ericsson settlement, $3.14 million was considered to be for "physical injury to tangible property."[3] Vicor claimed at trial that the insurers owed it the remaining $37 million because Vicor had paid that sum to Ericsson as a result of such "loss of use" damages. This total consisted of: 1) cash settlements of $7.5 million to CU; 2) free equipment to CU worth at least $6.6 million; 3) cash settlements to Cricket of $9.5 million; 4) free equipment to Cricket worth at least $10.1 million; and 5) emergency response costs of at least $6 million related to restoring failed customer networks.

---

[3]The insurers' remaining $9.8 million contribution was made pursuant to the policies' errors and omissions coverage, which is not part of this litigation.

The insurers' position is that repair costs, including emergency response costs, do not constitute loss of use damages. The issue came to a head during arguments over jury instructions. The insurers wanted loss of use damages to be defined to include "a recognized measure of loss of use, such as the rental value of substitute property, lost profits, lost sales, or a comparable, quantifiable measure representing extra costs incurred or the value of losing the benefit of using that property for the time reasonably necessary to repair and replace it."

The district court did not completely accept the insurers' argument. While a preliminary instruction noted that the case did not involve a claim for "actual repairs" to return damaged equipment back to its original condition, the trial judge informed counsel at the close of evidence of his view that "emergency steps to restore the network . . . seem to be the mirror image of loss of use. They are the steps to get the network up and running. . . . Beyond that, repairs are not covered."

Over the insurers' objections,[4] the district court ruled that three of Vicor's specific damage claims could go to the jury under the loss of use rubric:

- emergency repair costs in the amount of $5 to $6 million;

- the $9.5 million settlement between Cricket and Ericsson;

- $3.3 million in the delivery of emergency equipment to China Unicom.

Consistent with this ruling, the court instructed the jury, in relevant part, as follows on the loss of use issue:

---

[4]Vicor argues that the insurers' objections to the district court's instructions were not preserved because they did not raise the objections again after the judge issued a supplementary instruction in response to those objections. We disagree. Objections to the loss of use instruction were lodged after the district court announced its intention, prior to the charging conference at which the district court ultimately rejected the insurers' objections. We are satisfied that by bringing their objections to the court's attention, the insurers complied with Fed. R. Civ. P. 51. See Suprenant v. Rivas, 424 F.3d 5, 15 (1st Cir. 2005). Vicor focuses on a subsequent colloquy that took place after the charging conference, in which the court reiterated its earlier ruling. In response, the insurers asked that a "reasonable time" limitation be added to the "emergency repair" instruction. The district court complied. Vicor argues that the insurers' acquiescence to the supplemental "emergency repair" instruction waives the previously raised objection. However, Vicor omitted from its brief the question to which the insurers responded: "As a supplementary charge, saving your rights as to earlier matters, supplementary charge satisfactory . . .?" (emphasis added). Given this context, we find the jury instruction issue was neither waived nor forfeited when the insurers answered in the affirmative.

-10-

And the only damages, the only damages that Vicor can recover in this case are loss-of-use damages. And it appears undisputed that there was this settlement with Ericsson for $50 million. The insurance company -- not Casualty, the insurance companies, the Chubb companies, they kicked in 13, whatever it was, but something that didn't become clear to me until yesterday was none of that was for loss of use.

• • •

In car insurance, if you have loss-of-use damages and you get into an accident and your car's towed away, the loss-of-use damages cover renting another car so you can get on the road and have the benefit of a car and go to work and where you want to go with your car. They do not cover repairing your car.

So we have to take that -- and there's lots of cases on it, what judges look at. Lawyers all know them. Now we have to take that language and that concept and we have to fit it to this case. And here's how we're going to do that.

In this case the loss of use is the loss of use of that consumer person out there in Seattle or the provinces of China, I won't just confine it to Seattle, wherever Cricket towers were up who goes to make a call and they can't make a call. Or goes, has a call, and it goes down because that 120-degree sector is out because the power converter on that sector on that tower failed. That's a loss of use.

And, you know, the lawyers said no one -- we haven't got any evidence here that these people, their call was dropped so they sued. But that's not the point. The point is that Cricket and China Unicom, who are in the business of running these networks and advertise, one imagines, that their network is up and running and is a good network, when that loss of use occurs they have a problem.

-11-

So when they expend money, sort of in the nature --I won't say in the nature. Let me get right to it. When they take emergency response costs to bring their network back online, Cricket, China Unicom are entitled to come back against Ericsson, and Ericsson is entitled to come back against Vicor once it's understood that it's Vicor's product that has failed and caused this. Those are the loss-of-use damages that we're talking about; the emergency response costs to get the system up and running.

Now, those aren't rental costs, but we're not talking about rental costs in this type of situation. They are those reasonably understood emergency response costs to get the system up and running.

Well, given the mechanics here, one of the things that means is repairs. You pull out a defective power converter and you put in another power converter, you've repaired it. And I told you, well, repairs aren't covered. Here's how you're going to resolve that.

You have to ask yourself what was Cricket doing, what did Cricket think it was doing? What was China Unicom doing, on the evidence? What was Ericsson doing to back them up? What was Vicor doing to back up Ericsson? These are not the monies, the settlements, the -- I'll go through a list. These are the things that are taken because you've got an emergency. And people in good faith jump into action and spend money.

If Cricket jumps into action and spends money, if China Unicom jumps into action and spends money, if Ericsson spends money without regard to what their contract was, and Vicor, the same thing, if they jump into action and spend money to get the systems up and running, one, that's what we want responsible companies to do. And they're doing that, even if it constitutes repairs, they're doing that to get the system up and running. That's loss of use.

-12-

And if Cricket and China Unicom, in fact, did that and charged it back against Ericsson, and Ericsson, in fact, paid that, and then as part of the settlement charged it back against Vicor, then in this lawsuit Vicor can recover that from the insurance companies at least for these two years, if you find that there was such losses in the 2002/2003 year as well as 2003/2004.

Well, now, let me go through a litany of what is covered, and since it's all been mentioned in this case, what's not covered. Loss-of-use damages is covered. And that would cover these emergency response costs even if they include repairs, if those were the emergency repairs and everyone's saying let's get the system up and running. That's covered.

And if the Ericsson/Cricket settlement, if that paid Cricket for emergency response costs, then that's something that Ericsson incurred and they can charge that back against Vicor. But that does not include increased operating and maintenance costs and it doesn't include system upgrades, making it better than it was before.

•   •   •

Ericsson claimed [fraud] against Vicor. So much of the settlement, the Ericsson/Vicor settlement, if it included money for fraud, not covered. If it included money for repairs other than emergency response costs, not covered. Retrofit, going out to cell phone towers where there's nothing wrong but replacing the power converters, not covered. Goodwill. Ericsson's loss of goodwill, if any there was, not covered. Loss of business opportunity, Ericsson's ability to get new customers and the like because now the Ericsson product in these various places has failed, not covered. Ericsson's lost profits, not covered. Ericsson sues Vicor and says, Well, wait a minute, we paid this much for your power converters, give us our money back. Not covered. Investigation costs to figure

-13-

out what was the problem here. Not covered. Moving the units from the top of the pole down to the bottom of the pole so you could get at them easier, not covered. Cost of product replacement, not covered. I already said increased operating and maintenance costs, not covered. System upgrades not covered.

Emergency response costs, covered. That's loss of use. Whether that's -- whether that's proved by shipping immediately replacement parts in an emergency, whether it's paying as part of a settlement somebody else's, Cricket's emergency response costs, that is covered.

The jury returned a verdict the next day awarding Vicor $8 million in loss of use damages for the 2002-2003 policy period, and $9.3 million for the 2003-2004 policy period. The parties agree that this total consists of $8 million from the Ericsson-Cricket settlement, $3.3 million in emergency equipment provided to China Unicom, and $6 million for emergency response costs to restore customer networks.

In addressing the insurers' post-trial motions, the court cited certain provisions of the Ericsson-Cricket settlement agreement as the foundation of the verdict. Those terms required Ericsson to pay Cricket $8 million in two, $4 million dollar installments. One of these installments was made to Cricket to offset increased operating and maintenance expenses incurred by Cricket.

The court then recalled its jury instruction that increased operating and maintenance costs were specifically

excluded as loss of use damages. As a result, the district court granted the insurers partial relief, reducing the verdict by $4 million. The court, however, rejected the insurers' claims that the loss of use instruction erroneously included emergency response costs, and entered judgment in favor of Vicor for $13.3 million, plus interest.

All four parties appealed. Vicor argues that the district court should not have disturbed the jury's $17.3 million verdict. The insurers argue that the district court committed legal error when it allowed the jury to include emergency repair costs as loss of use damages. In addition, they argue that even if the instruction was correct, the record evidence did not, in any event, support the award. Also, the insurers argue that they were erroneously denied access to Vicor's counsel's underlying defense file from the Ericsson litigation. Separately, Continental asserts that judgment should have been entered in its favor because the verdict did not exhaust the underlying policy limits, and thus its excess policies were not implicated. Additionally, Vigilant and Federal argue that all damages should have been allocated to the 2003-04 policy period, limiting their exposure and bringing Continental's policy into play. As resolution of the loss of use issue determines the course of this appeal, we address it first.

-15-

## IV.  Discussion

### A.  Loss of Use Damages

The insurers argue that the district court erred by including emergency response costs within the definition of loss of use damages.  Vigilant and Federal raise the issue in the context of claiming that the trial court incorrectly instructed the jury.  Raising the same issue, Continental further asserts that the district court erred in denying its motion for judgment as a matter of law.  Regardless of the procedural posture in which the issue was raised, we review the relevant district court rulings regarding the loss of use instruction under a de novo standard.  See Latin Am. Music Co. v. Am. Soc. of Composers, Authors & Publishers, 593 F.3d 95, 99 (1st Cir. 2010) (claim of instructional error reviewed de novo); Butynski v. Springfield Terminal Ry. Co., 592 F.3d 272, 276 (1st Cir. 2010) (denial of motion for judgment as a matter of law reviewed de novo).

Under Massachusetts law, the interpretation of an insurance policy is a question of law for the court.  Cody v. Conn. Gen. Life Ins. Co., 439 N.E.2d 234, 237 (Mass. 1982).[5]  Where, as here, the relevant policy provisions are plainly expressed, those provisions must be enforced according to their terms and interpreted in a manner consistent with what an objectively

_____

[5]The parties agree that Massachusetts law governs the dispute insofar as interpretation of the subject insurance policies is concerned.

-16-

reasonable insured would expect to be covered. City Fuel Corp. v. Nat'l Fire Ins. Co. of Hartford, 846 N.E.2d 775, 778-79 (Mass. 2006).[6] Also, absent Massachusetts precedent, we may seek guidance from other courts' interpretations of standard policy provisions. Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006).

As previously noted, the provision at issue here is that which defines covered property damage to include "loss of use of tangible property that is not physically injured." Vicor urges an expansive interpretation based on the above language and the policies' more general provision that the insurers are responsible to "pay damages . . . for . . . property damage caused by an occurrence." Focusing on a dictionary definition of the word "for," Vicor argues that damages are covered if they "are a result of" loss of use of uninjured tangible property. In other words, Vicor claims that it was required only to establish a nexus between Ericsson's customers' (Cricket and CU) loss and the claimed damages. At oral argument, Vicor's counsel did not dispute that this formulation essentially amounts to but-for causation.

The insurers' position is premised on the idea that loss of use damages are subject to an implied temporal limitation that confines coverage to damages incurred due to the inability to use

_____

[6]None of the parties argue that the definition of property damage is ambiguous.

-17-

the failed equipment until it is replaced or repaired. In other words, because repair costs represent the cost of ending the loss of use period, such costs are not themselves damages for loss of use.

The district court attempted to strike a middle ground, explicitly instructing the jury that "repairs aren't covered" except those repairs that were part of an "emergency response" to the RBS failures, in order to "get the system up and running." While the trial court's effort is a laudable response to a thorny question, we conclude that it misses the mark.[7]

As recognized by the district court, the archetypal example of loss of use damages comes in the context of a damaged automobile. Simply put, the cost to rent a replacement vehicle while the damaged vehicle is being repaired would represent loss of use damages; the actual cost of repairs would not. See Urico v. Parnell Oil Co., 708 F.2d 852, 855 (1st Cir. 1983) (citing Antokol v. Barber, 143 N.E. 350, 352 (Mass. 1924)); Collin v. Am. Empire Ins. Co., 21 Cal. App. 4th 787, 818 (1994).

While the automobile analogy may be the most facile analytic tool, it is not the exclusive one. See Atmel Corp. v. St. Paul Fire & Marine Ins. Co., 430 F. Supp. 2d 989, 994 (N.D. Cal.

_____

[7]The parties agree that there are no reported cases using the "emergency repair" formulation in the context presented here. At the same time, however, we note that no cases have explicitly found the temporal limitation suggested by the insurers.

-18-

2006) ("The Court does not hold . . . that loss of use damages can only consist of rental value or its equivalent."); see also Continental Cas. Co., v. Gilbane Bldg. Co., 461 N.E.2d 209, 214 (Mass. 1984) (holding that where street was closed due to glass falling from nearby high-rise, restaurant rendered inaccessible to public could state claim for coverage by contractor's liability insurer for loss of use damages).

As discussed earlier, both sides of this dispute claim reliance on the plain language of the policy -- Vicor focusing on the term "for," and the insurers on a literal meaning of "loss of use." In the absence of definitive Massachusetts case law, the parties turn their attention to various California cases for guidance. As the facts of Atmel most closely resemble those present here, we turn to that case first. Atmel, an electronic chip manufacturer, sold faulty computer chips to its customer, Seagate, for use in disk drives that Seagate later sold. 430 F. Supp. 2d at 991. The defective chips eventually caused the Seagate drives to fail, although the failure did not cause physical damage to the drives. Id. Seagate customers who returned drives to Seagate were provided with a new drives or refurbished drives without the Atmel chip. Id. at 991-92. The Atmel chip was replaced in a significant number of drives that had not failed. Id. at 992.

Seagate subsequently sued Atmel, with the matter being settled by Atmel's $5.9 million payment to Seagate. Id. Discovery indicated that Seagate was seeking damages for: repair and replacement of drives with the defective chip; costs of shipping repaired drives to customers; the screening of drives at customer locations for Atmel chips; employee expenses related to investigation of the chip failure; maintenance of a reserve fund to cover potential liability to its customers due to drive problems; and various accommodations to Seagate customers, including credit toward future purchases and the free provision of new or refurbished replacement drives. Id.

Atmel sought coverage from its insurer, St. Paul, under a loss of use provision identical to the one at issue here. Atmel argued that because the failure of the Atmel chips caused Seagate customers to lose use of the disk drives, Seagate's damages were, therefore, loss of use damages. Id. at 994. The court rejected Atmel's argument, finding that the damages were not for loss of use, but were instead the costs of repairing and replacing the chips and drives. Id. Although the court agreed with Atmel's assertion that the damages would not have occurred absent the chip failure, it rejected the but-for analysis, stating, "Atmel's expansive definition of 'loss of use' damages includes any and all damages related to the failure of the Atmel chips in the Seagate drives, and does not require a nexus with Seagate's (or its

-20-

customers') inability to use the drives." Id. (emphasis in original). While rejecting St. Paul's argument that rental cost is the only proxy for loss of use damages, the court held that "the damages alleged by Seagate . . . were too attenuated from a 'loss of use,' and there must be a more direct connection between the damages and the loss of use of the property in order to establish coverage . . . ." Id. at 994-95.

The insurers urge the same result here. For its part, Vicor argues that Atmel's holding is limited to disclaiming costs to repair and replace the insured's (Atmel's or Vicor's) own product. But Atmel is not so limited. Seagate's claimed damages explicitly included repair and replacement of the drives themselves, and not just Atmel's chip. Atmel, 430 F. Supp. 2d at 994. Moreover, Vicor's argument ignores Atmel's overarching requirement of a "more direct connection" than simply but-for causation between the damages claimed and the loss of use of the property. Id. at 995.

Vicor advocates reliance on Anthem Electronics, Inc. v. Pacific Employers Insurance. Co., 302 F.3d 1049 (9th Cir. 2002), a case unsuccessfully relied upon by the insured in Atmel, which construed certain expenses as loss of use damages but whose outcome the Atmel court distinguished. We agree that the case is distinguishable both from Atmel and this case in ways that do not support Vicor's claim. In Anthem, the insured supplied defective

-21-

circuit boards to a manufacturer, KLA, which incorporated the circuit boards into scanners it sold. Id. at 1052. When some of the scanners failed, the manufacturer was forced to replace them and ultimately sued Anthem. Id. KLA identified among its damages: depreciation of loaner scanners provided to its customers while the defective ones were being repaired; inventory costs for scanners made unshippable due to the defect; and lost revenue due to customers failing to timely pay bills because of defective scanners. Id. at 1052.

Each of Anthem's insurers refused to defend the KLA lawsuit on the ground that the claimed losses were not covered. Id. at 1052-53. The Ninth Circuit reversed a grant of summary judgment to the insurers, holding that the insurers had a duty to defend Anthem because KLA's complaint "raise[d] the possibility that KLA suffered loss of use of the systems into which Anthem's circuit boards had been installed." Id. at 1058. "KLA's customers lost the use of tangible property (their scanners), and as a result KLA suffered losses due to loaner scanners and diminished receivables. KLA itself lost the use of unshippable scanners sitting in inventory, and as a result incurred unexpected inventory costs." Id. at 1057.

The Atmel court distinguished Anthem on two points. First, Anthem was a duty-to-defend case, in which the underlying complaint was examined only to see if a covered loss was a

-22-

possibility.  <u>Atmel</u>, by contrast, followed a settlement in which the insured was seeking indemnity based on an existing factual record.  <u>Atmel</u>, 430 F. Supp. 2d at 995; <u>see</u> <u>Anthem</u>, 302 F.3d at 1054 ("An insurer has a very broad duty to defend under California law.").  Second, the <u>Atmel</u> court found that the insured in <u>Anthem</u> "actually alleged damages suffered as a result of the loss of use of the scanners . . ."  <u>Atmel</u>, 430 F. Supp. 2d at 995.

Vicor argues that the costs for which Ericsson held Vicor liable were similar to those sought by Anthem, and the fact that Ericsson incurred them while making emergency repairs -- as opposed to in connection with "loaners" -- is of no moment, as they were incurred as a result of the unavailability of the inoperable RBSs. We disagree.  The common thread between <u>Atmel</u> and <u>Anthem</u> is that damages ascribed to loss of use in <u>Anthem</u> were accrued <u>pending</u> repair of the out-of-service scanners, while those excluded in <u>Atmel</u> were <u>for</u> the repair or replacement of the disk drives.  In this case, the "emergency repairs" allowed by the district court fall into the same category as the repairs in <u>Atmel</u>.  They are therefore not loss of use damages.  It is not enough to demonstrate, as Vicor attempts to do, that there was a "loss of use" of certain property (the power converters or the wireless networks) and that Vicor subsequently paid damages.  The claimed damages must be tied to the actual period during which the use of the non-physically injured property was lost and to the loss of use

itself.  See Urico, 708 F.2d at 855 (in context of damaged vehicle, loss of use damages compensates plaintiff for "finite period in which the vehicle is simply unavailable for use").

A third California case strengthens the insurers' position.  In F & H Construction v. ITT Hartford Insurance Company of the Midwest, 118 Cal. App. 4th 364 (2004), the insured, a subcontractor, installed steel pile caps of inadequate strength in a building.  Id. at 367.  The contractor later remedied the problem by welding additional support to the caps and sued the subcontractor's insurer for the costs related to the modification. Id.  The court agreed with the insurer that the additional costs did not constitute loss of use damages, noting that the contractor was not seeking damages for "rental value (or its equivalent)" and was not claiming damages "for the loss of use of the [facility under construction] during the time period modifications were made to the caps."  Id. at 377.  "[T]he only costs claimed by F & H are the costs for repairing and modifying the defective caps and for loss of the early completion bonus.  Those costs are unrelated to rental value."  Id.

As particularly relevant here, the court concluded, "[a] contrary conclusion would allow contractors and developers to obtain liability insurance for inferior or defective workmanship, a risk not covered by commercial liability insurance."  Id. (citations omitted).  This view is consistent with that of

Massachusetts's highest court, that "the goal of [liability insurance] is to protect the insured from claims of injury or damage to others, but not to insure against economic loss sustained by the insured due to repairing or replacing its own defective work or products . . . ." Commerce Ins. Co. v. Betty Caplette Builders, Inc., 647 N.E.2d 1211, 1213-14 (Mass. 1995) (citation omitted).[8]

Vicor's final assertion on this subject is that the district court properly instructed the jury that costs to repair or replace Vicor's power converters -- its own property -- were not covered, and therefore the jury necessarily awarded only costs related to the repair or replacement of Ericsson's RBSs, of which the Vicor power converter was only a small part. Putting aside the question of whether Atmel's holding is limited to cases of repairs to the insured's own product -- an interpretation we do not accept -- we conclude that the district court made no such distinction. While the instruction used the example of replacing a defective power converter with a new one as a non-covered "repair," it then went on to carve out an "emergency repairs" exception to the proscription on indemnity for general repair costs. In so doing, court did not differentiate between the power converters and the RBSs.

_____

[8]While the holding in Betty Caplette Builders was dependent on certain policy exclusions that the insurers do not press here, its comment on the general purpose of liability insurance remains applicable.

As a result, the district court's jury instruction referencing "emergency repairs" was erroneous. See Davignon v. Clemmey, 322 F.3d 1, 9 (1st Cir. 2003) (stating that a jury instruction is erroneous if it is incorrect as a matter of law). Moreover, given that the emergency repair costs were, pursuant to the jury instructions, a centerpiece of the putative loss of use damages considered by the jury, the error was prejudicial, and therefore the judgment must be vacated and a new trial held. See Costa-Urena v. Segarra, 590 F.3d 18, 24 (1st Cir. 2009).

As the insurers concede, however, an insured might be able to recover any extra expenses above the ordinary cost of repairs that reduce the eventual loss of use damages. This possibility, which we suspect the district court had in mind when formulating its jury instructions, is a corollary of the traditional requirement that a party must take reasonable measures to mitigate its damages. See Urico, 708 F.2d at 855. The catch is that an insured seeking to capitalize on this possibility must show that the mitigation measures (1) somehow differed from ordinary repairs and (2) resulted in a net savings, meaning that the added expense of the mitigation measures was less than the savings generated by the decreased loss of use damages. The first showing could be satisfied if, for example, overtime work hastened the pace of repairs to damaged property or the installation of a temporary mechanical fix preserved some degree of functionality for the

-26-

property until repairs could be completed.  The second showing demands a reasonable degree of certainty as to the amount the insured's loss of use damages would have been had the mitigation measures not been implemented.  Cf. Allens Mfg. Co. v. Napco, Inc., 3 F.3d 502, 505 (1st Cir. 1993) (explaining that a plaintiff cannot rely on speculation to prove damages).  In no case, of course, could an insured recover more than this amount, in keeping with the purpose of mitigation.

This possibility may be worth exploring on remand, if the evidence provides a justification for doing so.  Therefore, on remand, the district court should fashion jury instructions making clear that classic loss of use damages (such as lost profits or the rental value of substitute property) that are incurred while repairs are pending may be recovered by an insured, but the actual costs of repairs may not.  The district court also may instruct the jury regarding the duty to mitigate loss of use damages and may explain that the costs of reasonable mitigation measures are recoverable, provided that the mitigation measures are distinguishable from ordinary repairs and result in a net savings.[9]

---

[9]Given our decision on this issue, we decline to address the insurers' other arguments premised on a finding that the jury instruction was correct.

B.  Other issues raised by the insurers

   1.  Other evidence of loss of use

Beyond the jury instruction issue, the insurers assert, without much elaboration, that they are entitled to judgment in their favor because the record lacks any evidence of loss of use damages under the "correct" definition.  The testimony and other evidence adduced over eight trial days constitutes something of a mixed bag, especially with respect to the precise contours of Ericsson's payments to Cricket and CU.  Thus, given the district court's erroneous definition of loss of use damages, we believe this is an issue best resolved by the district court upon remand, with due consideration given to the appropriate measure of damages.

   2.  Insurers' Joint Motion to Compel

During the course of discovery, the insurers served various written requests for production of documents related to the Ericsson litigation and settlement.  In addition to substantial document production[10], Vicor also produced a privilege log, in which it justified the withholding of documents related to the defense of the Ericsson litigation on the basis of the attorney-client and work product privileges.  The district court denied the insurers' subsequent motion to compel without comment.  Continental appeals

---

[10]The insurers describe the production as consisting of over 6,500 documents; Vicor tallies the production at over 1 million pages.

-28-

that denial.  Because this issue was fully joined, and stands a strong likelihood of re-emerging after remand, we address it here.

At the heart of this dispute is the allocation of settlement monies Vicor paid to Ericsson between covered and uncovered claims.  We sketch the background of the parties' relationship before addressing the legal issue.

As previously described, Ericsson sued Vicor in California state court in May 2004.  Vicor promptly notified Vigilant and Federal[11] of the suit.  Subject to a reservation of rights because of potential coverage issues, the insurers agreed to provide defense and indemnity pursuant to the grant of coverage for information and network technology liability contained in Vigilant's errors and omission policy.  They declined coverage under their general liability policies because, in their view, Ericsson's complaint did not allege third-party property damage.[12]  When Ericsson amended its complaint, however, the insurers agreed to provide coverage under the general liability policy.  While Vicor, with the insurers' blessing, chose its own defense counsel, the insurers required counsel to comply with their billing

_____

[11]Continental, as an excess carrier, was not involved in these early skirmishes.

[12]The errors and omissions policy had lower limits and a narrower scope of coverage than the general liability policy.

guidelines and to provide periodic reports and evaluations as conditions for payment.[13]

Although Vicor and Ericsson settled the underlying suit for $50 million in March 2007, they created no formal allocation of the payments between covered and uncovered claims. Based on their own investigation, primary insurers Vigilant and Federal determined that the failure of the Vicor power converters caused slightly more than $3 million in third-party property damage that would be covered under the general liability policies. They also paid the remaining $9.7 million remaining on the technology liability coverage, with Vicor supplying $37 million to fulfill the terms of the settlement.

Fast-forwarding to the present litigation, exploration of the Ericsson-Vicor settlement eventually led to the deposition of Vicor official Richard Zengilowski, who could fairly be described as Vicor's "point man" with respect to negotiations with Ericsson. Zengilowski testified at his deposition that none of the $50 million paid to Ericsson was for non-covered claims. He described a process by which Ericsson's original claimed damages of $1-$3 billion morphed into negotiations in the $135-$200 million range, before the parties agreed on a settlement of $50 million. The insurers were skeptical of Zengilowski's assertion, primarily

---

[13]The insurers paid Vicor's counsel approximately $5 million. A dispute over whether this amount fully satisfied their obligation to pay for Vicor's defense is addressed, infra.

-30-

because Zengilowski also agreed during his deposition that various categories of Ericsson's claimed damages that Vicor's defense counsel had listed in a report it prepared prior to the mediation were not covered.  In light of this perceived discrepancy, the insurers requested that Vicor produce all documents withheld on privilege grounds that were part of the Vicor-Ericsson lawsuit.  As noted, the district court let Vicor's refusal stand.[14]  We review the district court's ruling for abuse of discretion.  Dennis v. Osram Sylvania, Inc. 549 F.3d 851, 859 (1st Cir. 2008).

The party asserting the attorney-client or work product privilege bears the burden of showing that the privilege applies. Hanover Ins. Co. v. Rapo & Jensen Ins. Servs., Inc., 870 N.E.2d 1105, 1114 (Mass. 2007).[15]  If the privilege is established, the

---

[14]After the motion to compel was denied, the insurers issued trial subpoenas seeking a subset of the underlying defense documents for purposes of cross examination.  The district court, while granting Vicor's motion to quash, ordered Vicor to bring the withheld documents to court during trial, should he "rethink it as we go along," in which case he would order production.  Vicor argues on appeal that the insurers' failure to raise the issue later during trial constitutes waiver.  We disagree.  In addition to the trial court stating that its decision on the motion to compel might be "law of the case" on the issue, the import of the judge's comment suggests that he would re-consider the issue, if at all, on his own initiative.  These factors lead us to conclude that the insurers did not "intentional[ly] relinquish[]  . . . a known right."  United States v. Carrasco-De-Jesus, 589 F.3d 22, 26 (1st Cir. 2009).

[15]State law undergirds our analysis of the attorney-client privilege in this diversity case.  See FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000); Fed. R. Evid. 501.

burden of proving any exception falls to its proponent. Ogden, 202 F.3d at 460.

The attorney client privilege "extends to all communications made to an attorney or counsellor . . . and applied to by the party in that capacity, with a view to obtain his advice and opinion in matters of law, in relation to his legal rights, duties and obligations, whether with a view to the prosecution or defence of a suit or other lawful object." Hanover Ins. Co., 870 N.E.2d at 1111 (quoting Hatton v. Robinson, 31 Mass. 416, 421 (1834)). The privilege attaches to any communication between attorney and client in confidentiality for the purpose of seeking, obtaining or providing legal advice or assistance. In Re Reorganization of Elec. Mut. Ins. Co., Ltd. (Bermuda), 681 N.E.2d 838, 840 (Mass. 1997).

"While the attorney-client privilege shields communications between attorney and client (and in some cases third parties), the work product doctrine protects an attorney's written materials and 'mental impressions.'" Comm'r of Revenue v. Comcast Corp., 901 N.E.2d 1185, 1200 (Mass. 2009) (citing Hickman v. Taylor, 329 U.S. 495, 510 (1947)). Codified in Mass. R. Civ. P. 26(b)(3), the doctrine protects from discovery documents prepared by a party's representative "in anticipation of litigation." Id.

at 314.[16]  The protection can be overcome if the party seeking discovery demonstrates "substantial need of the materials" and cannot obtain the "substantial equivalent" by other means without undue hardship.  Id.  Finally, an attorney or other representative's "mental impressions, conclusions, opinions, or legal theories" are afforded greater protection than "fact" work product, id., which includes "everything else that is eligible for protection as work product . . . ."  In Re Grand Jury Subpoena, 220 F.R.D. 130, 145 (D. Mass. 2004).

The insurers do not expressly dispute that the documents at issue fit within the ambit of the attorney-client privilege.[17]  Instead, they claim that they were entitled to them under either of two exceptions, known as the "common interest" and "at issue" doctrines.[18]  Because application of the former resolves this issue, we do not address the latter.

The insurers urge us to follow the lead of the Illinois Supreme Court in Waste Management, Inc., v. International Surplus

---

[16]Fed. R. Civ. P. 26(b)(3) is the analogous federal codification of Hickman.  See United States v. Textron, Inc., 577 F.3d 21, 25 (1st Cir. 2009) (en banc).

[17]The parties did not address the two privileges separately. Because they protect different interests, however, we will do so. United States v. Nobles, 422 U.S. 225, 238 n. 11 (1975) (citing Hickman, 329 U.S. at 508)).

[18]Only documents created during the Ericsson litigation are at issue in this appeal.  No communications made during the instant coverage litigation are being sought.

Lines Insurance Co., 579 N.E.2d 322 (Ill. 1991), which held that under the common interest doctrine, "when an attorney acts for two different parties who each have a common interest, communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the two parties." Id. at 328.

The parties expend significant energy debating whether Vicor and the insurers actually possessed a common interest during the Ericsson litigation, with Vicor arguing that the disputes that would later ripen into this coverage litigation undermine any common interest that may have existed. Vicor also points out that Waste Management has been criticized. See, e.g., Remington Arms Co. v. Liberty Mut. Ins. Co., 142 F.R.D. 408, 417 (D. Del. 1992) (declining to follow Waste Management's "strange theory"); see also PETCO Animal Supplies Stores, Inc. v. Ins. Co. of N. Am., No. 10-682 (SRN/JSM), 2011 WL 2490298 at *21 n. 12 (D. Minn. June 10, 2011) (listing cases rejecting Waste Management).

We need not, however, venture beyond application of Massachusetts law to resolve this issue. Massachusetts has recognized an exception to the privilege that "renders the privilege inapplicable to disputes between clients." Ogden, 202 F.3d at 461; Beacon Oil Co. v. Parelis, 160 N.E. 892, 894 (Mass. 1928). "Thus, when a lawyer represents multiple clients having a common interest, communications between the lawyer and any one (or more) of the clients are privileged as to outsiders, but not inter

sese." Id.; see also Dedham-Westwood Water Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, No. CIV.A. 96-00044, 2000 WL 33593142 at *3 (Mass. Super. Feb. 4, 2000) ("[W]hen an attorney has been retained to represent both insured and insurer in a third party action, communications by either party will not be privileged . . . even if their interests later diverge.") (quoting Hoechst Celanese Corp. v. Nat'l Union Fire Ins. co. of Pittsburgh, 623 A.2d 1118, 1123-24 (Del. Super. Ct. 1992)); EDO Corp. v. Newark Ins. Co., 145 F.R.D. 18, 23 (D.Conn. 1992) ("[c]ommunications between an insured and its attorney connected with the defense of underlying litigation are normally not privileged vis-a-vis the insured carriers in subsequent litigation").[19]

Vicor argues that the defense attorneys in the Ericsson litigation did not represent both Vicor and the insurers. Massachusetts law, however, considers an attorney retained by an

_____

[19]Massachusetts has also used the term "common interest doctrine" in a different way, interchangeably with the "joint defense privilege." There, the doctrine "prevents clients from waiving the attorney-client privilege when attorney-client communications are shared with a third person who has a common legal interest with respect to these communications. . . ." Cavallaro v. United States, 284 F.3d 236, 250 (1st Cir. 2002) (emphasis added). It is "typically understood to apply when two or more clients consult or retain an attorney on particular matters of common interest." Ken's Foods, Inc. v. Ken's Steak House, Inc., 213 F.R.D. 89, 93 (D. Mass. 2002) (citation and internal quotation marks omitted). "In such a situation, the communications between each of them and the attorney are privileged against third parties." Id. (citation and internal quotation omitted). This branch of the doctrine is not at issue here. Instead, it might have arisen in an attempt to shield communications between Vicor and its defense counsel from Ericsson in the underlying litigation.

insurer to represent the insured as the attorney for both. Imperiali v. Pica, 156 N.E.2d 44, 47 (Mass. 1959) ("[A]n attorney undertaking the defense of the case covered by the policy is an attorney for both the insurer and the insured . . . ."); Rhodes v. AIG Domestic Claims, Inc., No. 05-1360-BLS2, 2006 WL 307911 at *9 (Mass. Super. Jan 27, 2006).

Vicor further argues that the fact that the insurers tendered the underlying defense pursuant to a reservation of rights defeats any claim of a common interest. We disagree. It is undisputed that the primary insurers paid defense counsel and partially funded the settlement with Ericsson. That suffices to rebut Vicor's argument. Cf. Owens-Corning Fiberglass Corp. v. Allstate Ins. Co., 660 N.E.2d 765, 769 (Ohio Com. Pl. 1993) (no common interest where insurers neither provided representation nor indemnified insured in underlying suits).

Here, the record reflects multiple letters, reports and other communications between underlying defense counsel and the insurers regarding such matters as liability assessment, strategic litigation planning and calculations of potential damage outcomes. All were marked as "privileged and confidential," and the parties agree they were privileged as to third-parties, such as Ericsson. We agree with the reasoning set forth in RPM, Inc. v. Hartford Accident & Indemnity Co., Inc., No. 1:03CV1322, slip op. at 12-13 (N.D. Ohio, April 11, 2006) (quoted in 1 Barry R. Ostrager & Thomas

R. Newman, Handbook on Insurance Coverage Disputes § 2.08[b] (14th ed. 2008)): "Plaintiffs cannot have it both ways. They cannot make use of the benefit of the common interest exception to avoid waiver of the attorney-client privilege as to third parties and simultaneously assert the privilege against the parties with whom they share a common interest." Accordingly, we conclude that the district court erred, and Vicor cannot rely on the attorney-client privilege to shield all communications between it and underlying defense counsel.

Resolution of the work-product privilege issue requires less discussion. In the context of coverage litigation, it is a touchstone of such a claim that Vicor must demonstrate that its attorneys prepared the putatively shielded documents in anticipation of a lawsuit with the insurers. EDO Corp., 145 F.R.D. at 24; Textron, Inc., 577 F.3d at 29. In this case, events provide fairly clear lines of demarcation. Documents produced while the insurers were providing a defense are unlikely to be protected; those produced during the periods when the insurers denied coverage -- or refused to provide indemnity -- are likely to be protected. See EDO Corp., 145 F.R.D. at 24; Hoechst Celanese Corp., 623 A.2d at 1126. Given the fact that the precise nature of the Ericsson-Vicor settlement is crucial to a determination of which of Ericsson's claims are covered, the record supports the insurers' substantial need for at least some of documents at issue. Thus, to

the extent that the district court's denial of the insurers' motion to compel was based on application of the work product doctrine, the court abused its discretion.

These conclusions do not quite end the matter. Resolution of both the attorney-client and work product claims require a more precise examination of the course of the relationship between the parties as it relates to the Ericsson litigation and the juncture at which various communications were made. We acknowledge the difficulty entailed in the three-way relationship recognized by Massachusetts law. The fact that both the insured and insurer are deemed to be clients does not mean that all communications are excepted from the applicable privileges, or that the insurers are necessarily entitled to the entire defense file, as they claim. From the current record, however, we cannot make the necessary judgments about which materials are subject to disclosure. It is enough to say, however, that the district court abused its discretion in denying the insurers' motion to compel in its entirety, and upon remand, should tailor a discovery order consistent with this opinion, should the parties not be able to reach substantial agreement on their own. See Fed. R. Civ. P. 37(a)(1) (requiring parties to confer regarding discovery disputes or attempt to do so prior to filing motion to compel).

## C.  Vicor's cross-appeal

Vicor argues that the district court erred when it granted the primary insurers summary judgment on Vicor's Breach of Duty to Defend claim, which asserted that the insurers failed to meet their obligation to pay Vicor's reasonable attorneys' fees in the underlying litigation.  The record reflects that Vicor paid approximately $5.2 million of the $7.4 million billed by the two defense firms Vicor chose in the underlying suit.  The district court order granting the motion stated that the insurers had "discharged [their] obligations to pay reasonable legal fees." Fee awards are reviewed for abuse of discretion.  French v. Corporate Receivables, Inc. 489 F.3d 402, 403 (1st Cir. 2007).  We review the grant of summary judgment de novo.  Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009).

Vicor offers a number of arguments in support of its claim that the district court erred.  The first -- that the district court failed to explain how it arrived at the fee award sufficiently to allow evaluation on appeal -- carries the day.  Therefore we vacate the award so that the matter can be addressed on remand.  We briefly explain.

We are mindful of the Supreme Court's admonition that fee litigation can, but should not, transform into the tail that wags the dog.  See City of Burlington v. Dague, 505 U.S. 557, 566 (1992).  And while the district court's attorneys' fee findings

"need not be infinitely precise, deluged with details, or even fully articulated," Foley v. City of Lowell, 948 F.2d 10, 20 (1st Cir. 1991), "we must have some basis for understanding its reasoning." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, 553 F.3d 47, 74 (1st Cir 2009). While the record suggests that the issue was well-joined in the district court, the court's order provides us with no such basis of understanding. The insurers argue that we can affirm because the district court was presented with all relevant materials, and that "no elaboration is essential if the reviewing court can without difficulty discern the basis for the unexplained . . . finding from the record." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 41 (1st Cir. 2008).

While the above-cited case is correctly quoted, we noted in One Star Class Sloop Sailboat that the district court "cit[ed] book and verse, [and] found that [the prevailing party] had stubbornly persisted in litigating (and then losing) a cavalcade of issues." Id. Indeed, in a separate -- although brief -- order, the district court in that case addressed the parties' relative success, the appropriate hourly rate, and what he believed to be "overlitigation," in arriving at an award less than what the prevailing party had requested. See United States v. One Star Class Sailboat, No. 05-10192-WGY, 2008 WL 678519 at *1 (D. Mass. Jan. 9, 2008). Here, however, we have been provided with no analytical guideposts from which we can undertake a proper review.

Thus, we must vacate the grant of summary judgment as to the fee award and remand for further consideration of the claim.  We take no position on whether summary judgment is the appropriate vehicle to resolve the issue on remand.

## V.  Conclusion

The judgment of the district court is **vacated**.  The case is **remanded** for proceedings not inconsistent with this opinion.[20]  Each party shall bear its own costs.

---

[20]Given our vacatur of the judgment, we need not address Vicor's appeal of the district court's reduction of the verdict, or Continental's appeal of the judgment on the basis that its excess policy was not brought into play by the jury's allocation of damages over two separate policy years.